Docket No. 101265.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

LAWRENCE WADE, Appellant, v. THE CITY OF NORTH CHICAGO POLICE PENSION BOARD, Appellee.

*Opinion filed November 1, 2007.*

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Garman, and Burke concurred in the judgment and opinion.

Justice Kilbride took no part in the decision.

## OPINION

Plaintiff, Lawrence Wade, filed an application for a disability pension with defendant, the City of North Chicago Police Pension Board (Board). At the commencement of plaintiff's hearing before the Board, plaintiff's counsel requested limited consideration for a "duty-related disability pension" only, pursuant to section 3–114.1 of the Illinois Pension Code (Code) (40 ILCS 5/3–114.1 (West 2002)). Following a hearing, the Board denied plaintiff a line-of-duty disability pension on three independent bases, concluding that plaintiff "did not incur a disability from the performance of an act of duty," his "condition does not render it necessary for his suspension or retirement from police service," and "three doctors selected by the

pension board did not certify the Applicant as disabled," after conducting examinations of plaintiff pursuant to section 3–115 of the Code (40 ILCS 5/3–115 (West 2002)). Plaintiff thereafter filed an action for administrative review in the circuit court of Lake County, and the circuit court ultimately confirmed the Board's decision. Plaintiff then appealed to the appellate court, arguing that (1) the Board had denied him a fair and impartial hearing because it had relied solely on the medical report of one physician (Dr. James Milgram) in denying him a disability pension; (2) the Board's decision was contrary to the manifest weight of the evidence; and (3) the Board improperly interpreted section 3–115 of the Code to mandate that all three examining physicians selected by the Board certify the applicant disabled as a prerequisite to a disability award. The appellate court initially found that the Board had correctly interpreted section 3–115 and had properly denied plaintiff's application for disability pension benefits on that basis alone. Thus, the appellate court did not reach the other issues raised by plaintiff.

Plaintiff thereafter petitioned this court for leave to appeal. In conjunction with a denial of leave to appeal, we issued a supervisory order, directing the appellate court to vacate its judgment in *Wade v. City of North Chicago Police Pension Board*, 353 Ill. App. 3d 852 (2004), and remanding to that court, in light of *Turcol v. Pension Board of Trustees of Matteson Police Pension Fund*, 214 Ill. 2d 521 (2005), "to resolve the issue of whether the Board's determination that plaintiff had not proven his disability was against the manifest weight of the evidence." See *Wade v. City of North Chicago Police Pension Board*, 215 Ill. 2d 620 (2005) (supervisory order). On remand, the appellate court found that the Board's determination was indeed against the manifest weight of the evidence; however, the appellate court adhered to its earlier interpretation of section 3–115, and again upheld the denial of disability benefits on that basis. 359 Ill. App. 3d 224. We granted plaintiff's petition for leave to appeal. 210 Ill. 2d R. 315(a).

If the appellate court is correct in holding that the Board's determination *is* against the manifest weight of the evidence, then the question of section 3–115's proper interpretation is squarely before us; if the appellate court is incorrect, we need not address the interpretational issue. Therefore, we first consider whether the

-2-

Board's decision on disability was in fact against the manifest weight of the evidence. To that end, we set forth a summary of the evidence bearing upon that issue, consisting of plaintiff's testimony before the Board, his medical records, and the reports of examining physicians selected by the Board.

Plaintiff testified he was working "full duty" as a patrolman for the City of North Chicago on April 20, 2002, when he responded to the scene of an arrest to assist other officers in transporting an arrestee. As plaintiff was bringing the handcuffed prisoner from the scene of the arrest and down a steep, rocky embankment, the prisoner stumbled and began to fall. Plaintiff tried to keep the arrestee from falling, the two became entangled, and both "tumbled" to the bottom of the hill. Plaintiff testified when he stood up he felt pain in his right knee immediately. When he got back to the police station, he noticed, in addition to the pain, "some slight bruising" of the knee and swelling. From the police station, he was taken to the hospital, where an X-ray was taken, an immobilizer was applied to his leg, and he was given crutches.

Plaintiff was subsequently seen by Dr. Christ Pavlatos, who ordered magnetic resonance imaging (MRI) of plaintiff's knee. According to plaintiff, Pavlatos later told him the MRI had revealed two tears of the "inner and outer portion" of the right knee and, consequently, surgery would be required. Surgery was in fact performed, and plaintiff thereafter underwent eight weeks of physical therapy. Plaintiff recalled that, at some point during his postoperative recovery, "[t]here was some swelling and some fluid built up on the knee again." In response, his doctor drained fluid from the knee and on two occasions administered cortizone injections. Plaintiff testified that, after his May 2002 knee surgery, he worked in a sedentary capacity for the City of North Chicago until February of 2003. Plaintiff stated: "At that point I had my knee drained for the second time, another 25 CCs of fluid was taken out and two more injections. And at that point my doctor said, 'This knee is just not responding and you're just not able to work,' period." Plaintiff never returned to "full duty" as a patrolman.

Plaintiff testified, as of the time of the June 19, 2003, hearing, pursuant to doctors' orders, he was restricted to "a permanent sedentary type of work situation, a sit-down job." No doctor had

released him to go back to work as a patrolman. Plaintiff acknowledged receipt of a letter, dated September 23, 2002, from the deputy chief of operations for the City of North Chicago, advising him that the City of North Chicago did not have a permanent sedentary position for a police officer, and informing him he had two options: retire or apply for a disability pension. He obviously chose the latter course.

At the hearing, plaintiff testified that he experiences pain just walking. He rated his pain as 7 on a 10-point scale. He said his knee is weak and sometimes locks or buckles. He stated he sometimes experiences a grinding sensation in the knee. He claimed he "could only sit for about 20 minutes, stand for about 25 to 30 minutes, and walk for about 25 minutes," before he had pain in the knee. Plaintiff reiterated that he was working "full duty" prior to the April 2002 injury.

Plaintiff acknowledged preexisting problems with his knee in the fall of 2001, noting "the pain, the discomfort, the problems getting in and out" of his squad car. He stated he saw Dr. Pavlatos for that condition on December 27, 2001. Plaintiff said he could not recall missing work for any reason between that office visit and his April 2002 injury.

The Board had before it plaintiff's rather extensive medical records, most notably those evincing plaintiff's medical treatment with Dr. Roger Collins. An early entry in that file, dated July 30, 1992, indicates that plaintiff reported a 1989 injury to his right knee, sustained while playing football. According to plaintiff, the knee became painful and later became swollen. Also in that entry, plaintiff reported knee pain after participating in basketball games in November of 1991. With respect to his 1992 knee complaints, the file indicates that plaintiff reported pain in both knees "with prolonged sitting." He stated the first few steps after prolonged sitting might be "quite painful." At that time, he informed Dr. Collins that he had not experienced locking of the knees, but he had occasionally had bilateral buckling since 1989. He said he also occasionally had pain in the knees during sleep. X-rays taken in 1992 revealed "scant early degenerative changes" in plaintiff's knees.

The next entry in Dr. Collins' records is dated August 5, 1997. According to Collins' file, plaintiff was seen on that date for an

evaluation of his right knee. Plaintiff stated he had been running bases when he felt a "pop" in his right knee accompanied by immediate pain. The entry notes:

> "He recalls that he injured his knee in the past when he was about 27 years of age. He was playing football. He was on the ground and another player fell on his knees causing him to go into hyperextension. He developed immediate swelling."

Plaintiff reported having had problems with his knees for a number of years. Some symptoms were similar to those mentioned in the 1992 entry, such as pain and stiffness after sitting. Collins noted swelling of the right knee on the date of examination. After further assessment, Collins discussed the risks and benefits associated with surgery.

Plaintiff opted for surgery. Postoperative file entries dated August 19, August 25, and September 27, 1997, indicate, at the time of surgery, a "Grade II chondromalacia or thinning on the weight-bearing surface of the medial and lateral femoral condyles" was noted. Plaintiff was found to have "torn medial and lateral menisci" and "a defect on the patellofemoral groove." Collins performed "partial medial and lateral meniscectomies and a lateral release." Collins noted the findings of plaintiff's arthroscopy were "more consistent with what we would see with someone in their 50's, rather than someone who is 38 years of age."

Plaintiff's recovery from the surgery was problematic. A March 10, 1998, file entry indicates plaintiff had developed discomfort in the knee and was having difficulty with stairs. He had a persistent and "significant" swelling of his knee. Collins speculated it was "possible" that plaintiff had torn more of the lateral meniscus. He noted "[t]he posterior portion perhaps could have completely torn and displaced slightly," but he observed plaintiff did "not have mechanical symptoms." Collins decided to aspirate fluid from the knee, and followed that with an injection of "2 cc DepoMedrol and 5 cc Marcaine." In a subsequent entry, dated January 7, 1999, Collins reported that plaintiff was seen in the office reporting a "fair amount of swelling" over the previous month. In the assessment portion of that entry, Collins noted that plaintiff's "articular cartilage is probably progressively flaking off." Collins concluded: "I suspect in the long run, he will continue to have problems because he does have a fair amount of pathology within the knee."

It appears that plaintiff next consulted a physician for his knee problems on December 27, 2001, when he saw Dr. Christ Pavlatos. At that time, plaintiff reported he had "been having bilateral knee pain for the past 1½ years." He complained of discomfort and occasional swelling. Pavlatos' examination of plaintiff revealed "a little patellofemoral pain and trace medial joint line pain." Pavlatos stated: "We are probably dealing with patellofemoral pain with mild early degenerative arthritis." Pavlatos recommended therapy and directed plaintiff to return in six weeks. The file evinces a phone consultation on January 21, 2002, in which plaintiff reported "mild improvement," though he still had discomfort in the knee. Pavlatos recommended "light duty" until plaintiff improved his quad strength. A notation dated March 4, 2002, indicates that plaintiff had reported he was "doing much better," although he occasionally had "some discomfort." On that date, Pavlatos stated plaintiff could return to work at "full duty."

After plaintiff's reported knee injury of April 20, 2002, he again consulted with Pavlatos. On April 25, 2002, plaintiff reported having sustained a twisting injury to his knee and complained of "significant pain and swelling." Pavlatos' file entry of that date states: "Pain is along the medial and lateral aspect of his right knee. Nis [*sic*] history of a pop noted." Pavlatos' physical examination revealed effusion in plaintiff's right knee, mild patellofemoral pain, and flexion limited by pain. X-rays showed evidence of "patellofemoral and medial compartment arthritic changes." After reviewing plaintiff's MRI, Pavlatos observed what he believed to be "a medial and lateral meniscus tear." In Pavlatos' opinion, plaintiff had sustained "a new tear of the *** lateral side and possibly the medial side." Pavlatos recommended right knee arthroscopy to address "a new lateral meniscus tear and probable recurrent medial meniscus tear." As far as work was concerned, Pavlatos prescribed "a sit down job *** with no more than 4 hrs. per day working."

Surgery was performed on May 17, 2002. Pavlatos' operative report noted, *inter alia*, a "posterior horn tear of the medial meniscus" *and* a "degenerative flap tear of the lateral meniscus."

A postoperative notation dated May 29, 2002, states that plaintiff was doing well, but had some mild discomfort. Already, on that date, Pavlatos' notes indicate that he did not believe plaintiff could ever

-6-

return to full duty: "I do feel this patient will require a permanent position that involves no running or excessive standing and a sit down job would be my preference for this patient because of the degree of arthritis he has at this young age." Plaintiff returned for another appointment with Pavlatos on June 19, 2002. Pavlatos noted, "He's a little over four weeks post knee arthroscopy for an arthritic knee." Plaintiff continued to complain of occasional pain. Pavlatos' examination showed plaintiff still had a "trace" of effusion and limited flexion. Pavlatos aspirated "20 ccs of clear yellow fluid from [plaintiff's] knee and a cortisone injection was given." At a subsequent office visit on August 2, 2002, plaintiff again reported discomfort, "especially after prolonged periods of standing or excessive walking." Trace effusion was still noted, as was patellofemoral pain. Under the category of "impression," Pavlatos wrote: "Patient with degenerative arthritis with persistent patellofemoral pain." Under the heading, "recommendation," Pavlatos noted:

> "At this point I do feel that this patient will require permanent job modifications where he will need to have an office or desk type job because of the degree of arthritis that he does have in his knee. I do feel the arthritis was present prior to his accident, although it certainly could [have] been aggravated by his accident at work."

Plaintiff was seen by Pavlatos again on September 12, 2002, having been previously engaged in "sit down" work pursuant to Pavlatos' recommendation. Still, plaintiff reported having "significant pain" over the anterior medial aspect of his knee, with an occasional "catching sensation." Plaintiff said his pain was sometimes disabling to the point that he walked with a limp. Pavlatos' examination again revealed patellofemoral and medial compartment pain, and pain limiting flexion. Pavlatos' impression was: "Flare up of some arthritic changes in [plaintiff's] knee." The same impression was noted in entries dated September 24 and November 15, 2002. On the latter date, which was subsequent to the filing of plaintiff's October 2002 application for disability pension benefits, plaintiff reported periodic pain with "sitting and walking." In his examination of November 15, 2002, Pavlatos noted "no effusion, good flexibility, and good strength" in the knee. Nonetheless, Pavlatos concluded that plaintiff

needed to limit his activity to "office type work" and determined he could not work in the field as a police officer.

The record also shows that plaintiff was evaluated on September 4, 2002, by Dr. Mark Levin. It appears that Dr. Levin conducted an extensive and thorough examination of plaintiff and a meticulous and comprehensive review of his records.

Levin listed plaintiff's main complaint as "right knee pain that goes up to a 7/10." Plaintiff stated he experienced pain over the lateral aspect of his knee while walking and got some locking and occasional buckling. Plaintiff said he had been told by Dr. Pavlatos that he had "bone on bone contact" in the knee. He informed Levin he could "sit for 20 minutes, stand for 25-30 minutes, walk for 25 minutes and [had] no problem with driving." He could walk stairs, but experienced discomfort when doing so.

Levin noted that plaintiff had a previous history of right knee pain dating back to 1997. Although plaintiff did relatively well following his 1997 knee surgery, he again developed knee pain in December of 2001. Levin's notes indicate that plaintiff initially saw a Dr. Sommerville for his knee and was diagnosed with arthritis. He subsequently saw Dr. Pavlatos, who prescribed a regimen of physical therapy. Levin's entry states that plaintiff was off work, due to his knee problem, from December of 2001 to February of 2002; however, he *did* work "full-duty" from February of 2002 until April 20, 2002.

Levin's examination of plaintiff revealed trace effusion of the right knee and full extension and flexion. There was no tenderness of the knee, though plaintiff complained of pain over the hamstrings. Levin's review of plaintiff's standing X-rays revealed "arthritic changes both over the medial and lateral compartments." Although there was still "joint space maintained," Levin noted "signs of degenerative findings." Plaintiff's April 2002 sitting X-rays also showed arthritic changes of the right knee with "some minimal spurring of the patella" and "spurring of the medial femoral condyle and medial tibial plateau." Plaintiff's April 2002 MRI was consistent with contemporaneous X-rays insofar as it disclosed arthritic changes of the knee. The MRI also showed a medial meniscal tear. Operative photos from plaintiff's 2002 knee surgery confirmed that plaintiff had a tear of the posterior horn of the medial meniscus as well as a tear of the lateral meniscus. Levin

also reviewed plaintiff's postoperative progress reports and physical therapy records.

Based upon plaintiff's history, physical exam, radiographic studies and medical records, Levin diagnosed plaintiff with "tri-compartment arthritis of the right knee which would be chronic and longstanding" and noted that condition "would pre-date an injury from April 20, 2002." Levin observed: "The patient was symptomatic per his own report prior to that but had been working as a patrol officer from February to April."

Levin concluded that plaintiff appeared to be at "maximum medical improvement" but did "not appear to have the abilities to return back to work as a patrol officer because of the underlying arthritis of his right knee." Levin's report later reiterated that the "need for work restrictions is coming from his underlying knee arthritis," but immediately followed that observation with this statement: "It would appear that there was an aggravation from the episode of April 2002 which is now preventing this patient from returning back to work full-duty." Levin stated that plaintiff would be capable of working on a permanent basis at a sedentary position.

Plaintiff was subsequently advised that the North Chicago police department had no permanent sedentary position for a police officer, and, on October 8, 2002, he filed an application with the Board for a disability pension. At that time, plaintiff did not specify whether he was seeking a line-of-duty (see 40 ILCS 5/3–114.1 (West 2002)) or a nonduty (40 ILCS 5/3–114.2 (West 2002)) disability pension. However, he subsequently indicated that he was seeking a "duty-related disability pension" only. Pursuant to section 3–115 of the Code (40 ILCS 5/3–115 (West 2002)), three physicians were selected by the Board to examine plaintiff: Dr. John Dwyer, Dr. Christopher Reger, and Dr. James W. Milgram.

Drs. Dwyer and Reger found plaintiff to be disabled from a "work-related" injury and each signed a "physician's certificate," checking the "disabled" option on the certificate. We note there was also a "not disabled" option on the certificates utilized in this case as a means to address both alternatives on the issue of disability. Though both doctors believed plaintiff was disabled from a work-related injury, they acknowledged, in their accompanying reports, that he had preexisting problems with his right knee.

Dr. Dwyer's accompanying report evinced an extensive examination of plaintiff with very specific findings regarding range of motion, appearance and function. Dwyer noted "visible swelling about the right knee." He stated that plaintiff demonstrated "post arthroscopy knee with residual impairment there, chronic synovitis with instability." According to Dwyer's report, plaintiff said he had surgery on his right knee in 1997 "and returned to work on full duty with no problem until the incident of 4-20-02. He denies any other serious illness or injury." Dwyer notes that plaintiff had reported:

> "[B]y the time he prepares a meal for himself standing the whole knee is sore. Prolonged walking also increases pain. He stated the pain radiates up into the right thigh. If he sits too long the knee locks. The knee swells and he ices it."

Dr. Dwyer concluded that plaintiff could not perform the duties of a street officer and noted that his "history certainly delineates a work related condition." Significantly, Dwyer noted that plaintiff had surgery on his knee *prior to* the injury at issue in these proceedings, and "a successful return to his normal occupation as a police officer was seen."

Dr. Reger also conducted an extensive examination and, in his words, a "meticulous evaluation of records, and review of [plaintiff's] MRI and imaging studies." Reger observed there were "mild to moderate osteoarthritic changes about the right knee," which were most likely "present prior to this injury." Reger also noted both plaintiff's prior injury in 1997 and his subsequent surgery. Reger's examination of plaintiff revealed some "mild swelling" of the right knee and mild medial joint tenderness upon palpation. Plaintiff complained of some discomfort in his knee as it was manipulated during the examination. In the report accompanying his certificate, Reger concluded that plaintiff was permanently disabled and stated his belief that the cause of plaintiff's disability was a work-related injury. He observed that plaintiff "did have a timely work up after his injury, and it did show a new meniscal tear." Given plaintiff's previously repaired meniscal tear, Reger believed plaintiff was at a "higher risk for reinjury, which did occur in this case."

In his report, Dr. Milgram acknowledged the medical history plaintiff reported to him, but his recitation makes clear that he did not commit to that history as verified. He noted that plaintiff "has had no

repeat MRIs or x-rays since the surgery. He brought with him no tests." In his examination of plaintiff, Milgram observed full range of motion, no swelling, no fluid accumulation, no marked tenderness, and good alignment and extension. Milgram took X-rays of plaintiff's knees and determined that "bilateral three compartment disease" was present in both knees. Milgram concluded that plaintiff had degenerative bilateral arthritis in both of his knees and that condition preexisted any duty-related incident. Milgram felt, if plaintiff were "so motivated[,] he could return to work as a police officer at the present time without restriction." Consistent with the skeptical tone that pervades Milgram's report, he states:

> "I have reviewed the medical records and in no area that I have reviewed is there a history given by the patient to his treating physician that his knee popped when he fell down the embankment. Therefore, this is a new history that the patient is giving to me. The records do not show that type of an injury. He was diagnosed by his own doctor as having bilateral arthritis of both knees and the doctor felt that he might have tears of his cartilage. Indeed he did have tears of the cartilage, but as described in the operative note, they appear to be degenerative type of tears and chronic. They certainly do not appear to be like a new tear that just occurred and I think there is a significant likelihood that the tears treated by Dr. Pavlatos are pre-existing disease and not traumatic tears caused by a new injury. I think the patient does not have also a degree of arthritis which is disabling from work as a police officer ***."

Thus, Dr. Milgram did not find plaintiff to be disabled, much less disabled from a work-related injury.

Following plaintiff's hearing, the Board denied plaintiff a line-of-duty disability pension on three independent bases, concluding that plaintiff "did not incur a disability from the performance of an act of duty," his "condition does not render it necessary for his suspension or retirement from police service," and "three doctors selected by the pension board did not certify the Applicant as disabled," pursuant to section 3–115 of the Code (40 ILCS 5/3–115 (West 2002)). In its analysis, the Board found Dr. Milgram more credible than the other physicians and assigned greater weight to his opinion. The Board also

relied on Dr. Levin's report and plaintiff's extensive prior medical treatment and injuries.

As noted, the circuit court confirmed the Board's decision upon administrative review, and the plaintiff appealed. Although the appellate court initially found it unnecessary to address the evidentiary sufficiency of the Board's decision, given the court's determination that a disability pension was properly denied because three Board-selected physicians had not certified plaintiff disabled, upon remand we directed the appellate court to address the evidentiary question. In doing so, the appellate court framed the issue, and summarized the evidence, as follows:

> "It is undisputed that plaintiff has preexisting arthritis of his right knee. The dispute focuses on whether the April 20, 2002, accident caused a new tear to plaintiff's knee or whether the tear preexisted the accident. Four of the five physicians who examined plaintiff concluded that plaintiff was disabled as of the date of the accident. Dr. Pavlatos believed that the accident caused a new tear. Dr. Levin concurred in this conclusion. Dr. Milgram on the other hand believed that any tears preexisted the accident, and the Board found Dr. Milgram more credible, assigning more weight to his opinion. Thus, this case turns on whether the record contains any evidence to support Dr. Milgram's finding that plaintiff did not suffer a new tear to his knee when he fell down the embankment." 359 Ill. App. 3d at 229.

Plaintiff argued below that, given the evidence, Dr. Milgram's finding was baseless and unreliable and that the Board therefore erred in assigning so much weight to Dr. Milgram's opinion. The appellate court agreed with that assessment. See 359 Ill. App. 3d at 229.

The appellate court noted that Milgram had concluded the accident did not cause a new tear to plaintiff's knee, in part, because plaintiff did not report to his doctor that his knee had popped when he tumbled down the embankment. However, as the appellate court observed, the record indicates that plaintiff did in fact report to Dr. Pavlatos that he felt his knee pop at the time of the accident. 359 Ill. App. 3d at 230. The court concluded that Milgram's misstatement of the evidence showed that Milgram "either selectively disregarded, failed to recall, or never reviewed portions of plaintiff's medical

-12-

records" and he "disregarded evidence that supports the finding that plaintiff suffered a new tear." 359 Ill. App. 3d at 230. The court also found it "particularly troubling" that, "although he stated that he reviewed plaintiff's 'medical records,' nowhere in his report did Dr. Milgram indicate that he specifically examined the MRI taken by Dr. Pavlatos following plaintiff's accident." 359 Ill. App. 3d at 230.

Moreover, the court observed:

> "Dr. Milgram based his finding that plaintiff is not disabled on his beliefs that plaintiff 'does not have a degree of arthritis which is disabling from work as a police officer' and that he lacks motivation. This 'lack of motivation analysis' is vague and has no scientific basis in fact because the report does not consider, as the other examining physicians did, plaintiff's current symptoms regarding the use of his knee, *i.e.*, that his knee locks occasionally, that he experiences some pain in his knee when he climbs up and down stairs, and that his knee swells and feels tender when he does any strenuous activities. Dr. Milgram's opinion also fails to account for how these symptoms might affect plaintiff's work as a full-duty police officer." 359 Ill. App. 3d at 230.

The court determined that Dr. Milgram "was not credible, because his conclusions were inconsistent with the facts available to him," and concluded that "the Board erred in assigning greater weight to Dr. Milgram's opinion, because he failed to consider or to base his opinion on relevant, material evidence that was key under the circumstances of this case." 359 Ill. App. 3d at 230. Thus, the appellate court held that the Board's determination on disability was against the manifest weight of the evidence. 359 Ill. App. 3d at 231.

The court then went on to address the issue of statutory construction, ultimately determining, as it had in its prior disposition, that section 3–115 of the Code requires that a pension board deny disability benefits unless all three examining physicians selected by the board certify that the applicant is disabled. 359 Ill. App. 3d at 238. The court concluded with a quote from Justice Cardozo: " 'We do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason. We take this statute as we find it.' " 359 Ill. App. 3d at 238, quoting F. Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.

-13-

L. Rev. 527, 534 (1947), quoting *Anderson v. Wilson*, 289 U.S. 20, 27, 77 L. Ed. 1004, 1010, 53 S. Ct. 417, 420.

We begin our analysis with the issue of evidentiary sufficiency, and the standards of review applicable thereto. In administrative cases, we review the decision of the administrative agency, not the determination of the circuit court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006). Section 3–148 of the Code (40 ILCS 5/3–148 (West 2002)) provides that judicial review of the decision of the Board is governed by the Administrative Review Law (735 ILCS 5/3–101 *et seq*. (West 2002)), pursuant to which, our review extends to all questions of fact and law presented by the entire record. 735 ILCS 5/3–110 (West 2002); *Marconi*, 225 Ill. 2d at 532; *International Union of Operating Engineers, Local 148 v. Illinois Department of Employment Security*, 215 Ill. 2d 37, 61 (2005).

Rulings on questions of fact will be reversed only if they are against the manifest weight of the evidence. *Marconi*, 225 Ill. 2d at 532; *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 471-72 (2005). "An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). In contrast, we review questions of law *de novo* (*Branson v. Department of Revenue*, 168 Ill. 2d 247, 254 (1995)), and a mixed question of law and fact is reviewed under the clearly erroneous standard (*Marconi*, 225 Ill. 2d at 532). In *Marconi*, we applied the manifest weight standard to the "the question of whether the evidence of record supports the Board's denial of plaintiff's application for a disability pension," noting that is a question of fact. *Marconi*, 225 Ill. 2d at 534, 543. That standard applies here as well. Under any standard of review, a plaintiff in an administrative proceeding bears the burden of proof, and relief will be denied if he or she fails to sustain that burden. See *Marconi*, 225 Ill. 2d at 532-33, citing *Miller v. Hill*, 337 Ill. App. 3d 210, 216 (2003).

As appellate panels have observed, a disability pension may be based upon the line-of-duty aggravation of a preexisting physical condition. See *Alm v. Lincolnshire Police Pension Board*, 352 Ill. App. 3d 595, 598 (2004); *Barber v. Board of Trustees of Village of South Barrington Police Pension Fund*, 256 Ill. App. 3d 814, 818

(1993) ("There is no requirement that the duty-related incident be the originating or primary cause of the injury, although a sufficient nexus between the injury and the performance of the duty must exist").

With these precepts in mind, we turn again to the evidence adduced in this case, and the Board's decision, based on that evidence. Other than the opinion of Dr. Milgram, there is no medical evidence whatsoever to support a finding that plaintiff was *not* disabled for full duty as a police officer, and there was abundant medical evidence that he *was* disabled. As previously noted, Drs. Pavlatos, Levin, Dwyer and Reger all found plaintiff to be disabled such that he was unable to perform in a full-duty capacity as a police officer. Drs. Pavlatos and Levin specifically found that the April 2002 injury aggravated plaintiff's preexisting condition, rendering him disabled. The reports of these doctors evince examinations more thorough than that conducted by Dr. Milgram, and analyses that were more complete and better substantiated. We note that we have before us the same records and reports examined by the Board; the doctors did not testify, and thus factors such as the demeanor of testifying witnesses does not figure into an assessment of credibility. Having thoroughly examined those records, we find it, frankly, incomprehensible that the Board would credit the opinion of Dr. Milgram and reject the opinions of the other doctors.

As the appellate court noted, Dr. Milgram's "misstatement of the evidence" shows that he either "selectively disregarded, failed to recall, or never reviewed portions of plaintiff's medical records." See 359 Ill. App. 3d at 230. Milgram claimed that he had reviewed plaintiff's medical records and in no area that he had reviewed was there a history given to plaintiff's treating physician that his knee had popped when he fell down the embankment. Milgram found that omission significant, and he observed, "this is a new history that the patient is giving to me." The suggestion–which is consistent with the skeptical tone that pervades Milgram's report–is that the plaintiff was making things up as he went along. Milgram's misconception may well have led to his otherwise unsupported conclusion that, if plaintiff were so motivated, "he could return to work as a police officer *** without restriction." In fact, the record indicates that plaintiff *did* make a report of a knee pop to his treating physician, Dr. Pavlatos, on April 25, 2002, five days after his injury.

More evidence of Milgram's cursory review of the record can be found in his blanket statement that the tears of plaintiff's cartilage, "as described in the operative note, \*\*\* appear to be degenerative type of tears and chronic." While Dr. Pavlatos *did* describe one tear of the meniscus as a "degenerative flap tear," he did not so characterize the other. Even if he had, that description would not necessarily impose any chronology with respect to the date of the tear, as Milgram would suggest. Furthermore, Milgram himself never addressed Pavlatos' preoperative assessment of plaintiff's MRI–an MRI that Milgram apparently *never* reviewed–wherein Pavlatos stated his belief that plaintiff had at least one *new* tear of his meniscus. In short, Milgram provides no factual basis for his conclusion that the tears treated by Dr. Pavlatos were "pre-existing disease and not traumatic tears caused by a new injury."

Finally, as the appellate court notes, Milgram's report fails to consider, as did the reports of the other examining physicians, plaintiff's current symptoms, *i.e.*, "that his knee locks occasionally, that he experiences some pain in his knee when he climbs up and down stairs, and that his knee swells and feels tender when he does any strenuous activity." 359 Ill. App. 3d at 230.

We agree with the appellate court's conclusion that Dr. Milgram "was not credible, because his conclusions were inconsistent with the facts available to him" and that "the Board erred in assigning greater weight to Dr. Milgram's opinion, because he failed to consider or to base his opinion on relevant, material evidence that was key under the circumstances of this case." 359 Ill. App. 3d at 230. We feel compelled at this juncture to remind Board members that, under the Pension Code, a pension board owes a fiduciary duty toward its participants and beneficiaries. See *Board of Trustees of the Barrington Police Pension Fund v. Village of Barrington Ethics Board*, 287 Ill. App. 3d 614, 616 (1997). Even under the manifest weight standard applicable in this instance, the deference we afford the administrative agency's decision is not boundless. We hold, as did the appellate court, that the Board's decision was against the manifest weight of the evidence.

We now turn to the issue of section 3–115's proper construction. Section 3–115 of the Code provides in pertinent part:

"A disability pension shall not be paid unless there is filed with the board certificates of the police officer's disability, subscribed and sworn to by the police officer if not under legal disability, or by a representative if the officer is under legal disability, and by the police surgeon (if there be one) and 3 practicing physicians selected by the board. The board may require other evidence of disability." 40 ILCS 5/3–115 (West 2002).

Two lines of appellate authority have developed with opposing interpretations of section 3–115. One line, represented by *Rizzo v. Board of Trustees of the Village of Evergreen Park Police Pension Fund*, 338 Ill. App. 3d 490 (2003), among other cases, has interpreted section 3–115 of the Code to prohibit a board from granting a disability pension unless three practicing physicians, selected by the board, have filed certificates stating that the applicant is disabled due to a duty-related injury. An opposing view is represented by *Coyne v. Milan Police Pension Board*, 347 Ill. App. 3d 713 (2004), in which the appellate court held that the statute only requires three medical certificates addressing an applicant's *disability status*. Under the *Coyne* construction, even if one doctor does not certify that an applicant is disabled, the applicant can still obtain a pension if *the board* finds the applicant disabled. The majority in *Coyne* rejected the pension board's construction of section 3–115–which was consistent with *Rizzo*–reasoning as follows:

"We believe the Board's interpretation of section 3–115 yields a result that is both absurd and unconstitutional. Although the Board adjudicated several issues other than the certificate requirement, such action was superfluous if the Board's interpretation of that requirement is carried to its logical conclusion. As a threshold matter in all cases, the three physicians specified in section 3–115 would each have to certify that the applicant was disabled for police work. The opinion of a lone minority dissenter like Doctor Harris (five contrary opinions notwithstanding) would *ipso facto* defeat a pension claim, thus rendering section 3–115 a virtual summary dismissal provision. A pension board would have no use for an evidentiary hearing in such cases because, regardless of the weight of the claimant's evidence, and regardless of any

-17-

credibility issues pertaining to the lone dissenting physician, the outcome of the case would be predetermined by the mere existence of a disagreement between witnesses. We cannot believe the legislature would establish the adjudicatory process outlined in the Pension Code expecting that the process would be so easily precluded." *Coyne*, 347 Ill. App. 3d at 729.

The dissenting justice in *Coyne* registered his belief that the phrase "certificates of the police officer's disability" is unambiguous and must be given its plain and ordinary meaning. He criticized the majority's construction of the statute, calling it "tortured" and "Clintonesque." *Coyne*, 347 Ill. App. 3d at 730-31 (Schmidt, J., concurring in part and dissenting in part). Justice Schmidt suggested that section 3–115 provides a way around the potential inequity of his interpretation of the statute insofar as it provides "the board may require other evidence of disability" (40 ILCS 5/3–115 (West 1996)) in addition to the reports and/or certificates of the three physicians initially selected by the board. *Coyne*, 347 Ill. App. 3d at 731 (Schmidt, J., concurring in part and dissenting in part). He concluded, "there is nothing in the statutory language to stop a claimant from petitioning the Board to appoint a fourth physician to examine him in an effort to secure the necessary three certificates of disability." *Coyne*, 347 Ill. App. 3d at 732 (Schmidt, J., concurring in part and dissenting in part).

The cardinal rule of statutory construction, to which all other canons and rules are subordinate, is to ascertain and give effect to the intent of the legislature. *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 64 (2004), citing *McNamee v. Federated Equipment & Supply Co.*, 181 Ill. 2d 415, 423 (1998). Although a court should first consider the language of the statute, a court must presume that the legislature, in enacting the statute, did not intend absurdity or injustice. *Adams*, 211 Ill. 2d at 64, citing *McNamee*, 181 Ill. 2d at 423-24. " 'A statute or ordinance must receive a sensible construction, even though such construction qualifies the universality of its language.' " *Adams*, 211 Ill. 2d at 64, quoting *In re Illinois Bell Switching Station Litigation*, 161 Ill. 2d 233, 246 (1994). Where the intent of the legislature is otherwise clear, the judiciary possesses the authority to read language into a statute which has been omitted through legislative oversight. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 60 (2006). When a literal interpretation of a statutory term would lead to

consequences that the legislature could not have contemplated and surely did not intend, this court will give the statutory language a reasonable interpretation. *In re Marriage of Eltrevoog*, 92 Ill. 2d 66, 70-71 (1982), citing, *inter alia*, 2A A. Sutherland, Statutory Construction §45.12 (4th ed. 1973). A statute should be interpreted so as to promote its essential purposes and to avoid, if possible, a construction that would raise doubts as to its validity. *Morton Grove Park District v. American National Bank & Trust Co.*, 78 Ill. 2d 353, 363 (1980). Statutes are presumed constitutional, and courts have a duty to construe enactments by the General Assembly so as to uphold their validity if there is any reasonable way to do so. *People v. Jones*, 223 Ill. 2d 569, 595-96 (2006). Consistent with this obligation, we will not consider a constitutional question if the case can be decided on other grounds. If a court can resolve a case on nonconstitutional grounds, it should do so. *People v. Lee*, 214 Ill. 2d 476, 482 (2005).

The construction of a statute is a question of law, which we review *de novo*. *In re Estate of Dierkes*, 191 Ill. 2d 326, 330 (2000). The language of a statute is generally considered to be the most reliable indication of the legislature's objectives in enacting that particular law. *Southern Illinoisan v. Illinois Department of Public Health*, 218 Ill. 2d 390, 415 (2006). "However, if the language of a statute is ambiguous, [courts] may look to tools of interpretation *** to ascertain the meaning of a provision." *People v. Taylor*, 221 Ill. 2d 157, 163 (2006); see *Balmoral Racing Club, Inc. v. Topinka*, 334 Ill. App. 3d 454, 460 (2002). "A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses." *People v. Jameson*, 162 Ill. 2d 282, 288 (1994), citing 2A N. Singer, Sutherland on Statutory Construction §45.02 (5th ed. 1992).

The justices of the *Coyne* court found the statute to be capable of being understood in two different senses: either requiring physician's certificates actually *finding* the applicant disabled, or requiring certificates merely *addressing* the issue of disability. The *Coyne* majority settled upon the latter interpretation as the one intended by the legislature. We find support for such an interpretation in the documentation employed by the Board in *this* case. We note that the "Physician's Certificate" utilized by the North Chicago Police Pension Board in fact provides the reporting physician with two optional

findings: "disabled" and "not disabled." Thus, the certificates used in this matter were certificates *addressing* the issue of disability. In any event, we find the statutory language of section 3–115, pertaining to physician certification, sufficiently ambiguous to warrant resort to other aids or tools of interpretation.

It is appropriate statutory construction to consider similar and related enactments, though not strictly in *pari materia. DeLuna*, 223 Ill. 2d at 59-60; *People v. Masterson*, 207 Ill. 2d 305, 329 (2003); *Board of Education of City of Chicago v. A, C & S, Inc.*, 131 Ill. 2d 428, 468 (1989). We must presume that several statutes relating to the same subject are governed by one spirit and a single policy, and that the legislature intended the several statutes to be consistent and harmonious. *DeLuna*, 223 Ill. 2d at 60; *Masterson*, 207 Ill. 2d at 329; *People ex rel. Killeen v. Kankakee School District No. 11*, 48 Ill. 2d 419, 422 (1971). In this respect, we note that the Illinois Pension Code contains provisions pertaining to firefighters that are very similar to those applicable to police officers.

Section 4–110 of the Illinois Pension Code provides in pertinent part:

> "If a firefighter, as the result of sickness, accident, or injury incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty, is found, pursuant to Section 4–112, to be physically or mentally permanently disabled for service in the fire department, so as to render necessary his or her being placed on disability pension, the firefighter shall be entitled to a disability pension ***." 40 ILCS 5/4–110 (West 2002).

Section 4–112 of the Code provides in part:

> "A disability pension shall not be paid until disability has been established *by the board* by examinations of the firefighter at pension fund expense by 3 physicians selected by the board and such other evidence as the board deems necessary." (Emphasis added.) 40 ILCS 5/4–112 (West 2002).

At least two appellate panels have applied section 4–112 of the Code in such a manner that *the board*, rather than any individual examining physician, is the ultimate arbiter of disability and consequent eligibility for pension benefits. See *Bowlin v.*

*Murphysboro Firefighters Pension Board of Trustees*, 368 Ill. App. 3d 205, 210-12 (2006); *Village of Oak Park v. Village of Oak Park Firefighters Pension Board*, 362 Ill. App. 3d 357, 369 (2005). Although the appellate court in *Graves v. Pontiac Firefighters' Pension Board*, 281 Ill. App. 3d 508, 510 (1996), in the course of addressing *other* issues, loosely paraphrased section 4–112 as stating "A disability pension shall not be paid unless three physicians selected by the Board have determined by examinations that the firefighter is disabled," that reference rearranges the language of section 4–112 so as to change its meaning. In any event, the proper interpretation of section 4–112 was not at issue in *Graves*. See *Graves*, 281 Ill. App. 3d at 510-16.

*Bowlin*'s and *Oak Park*'s application of the language of section 4–112 of the Code clearly–and consistently with principles of due process–places the decision as to a firefighter's disability within the purview of the pension board. Although the language of section 3–115 is less clear, we believe there is no real question as to the legislature's intent. In *DeLuna*, in the course of construing fraudulent-concealment provisions pertaining to statutes of repose, we found it "inconceivable" that the legislature would have intended to treat attorneys differently than physicians. *DeLuna*, 223 Ill. 2d at 73. If anything, it is even *more* "inconceivable" that the legislature would have intended to treat these classes of emergency responders (firefighters and police officers) differently for purposes of ascertaining disability, making the *pension board* the decisionmaker for purposes of section 4–112, but effectively placing any one of three board-selected physicians in that position for purposes of section 3–115. That cannot be what the legislature intended.

The legislature has provided that the board of trustees of a police pension fund is the entity statutorily empowered to verify an applicant's disability and right to receive benefits. 40 ILCS 5/3–114.1(d) (West 2002). The board is ultimately responsible for administering the fund and designating beneficiaries. 40 ILCS 5/3–128 (West 2002). To read the statute as requiring the concurrence of all three board-selected physicians would mean that one doctor, out of the three selected by the board, could determine that the applicant is not entitled to benefits, and, even though that opinion conflicts with the well-reasoned opinion of every other doctor, the board would be

powerless to override that opinion and authorize the payment of benefits to a disabled applicant. In fact, any hearing conducted by the board subsequent to the filing of that doctor's certificate would be a meaningless exercise, as no disability could be authorized, regardless of the strength of the applicant's evidence of disability. Again, that result cannot be what the legislature intended.

We could, of course, read the statute as the dissenting justice in *Coyne* did, to allow the board to appoint a *fourth* physician–and perhaps more–to validate, for statutory purposes, a result the board deems appropriate based on medical evidence already before it. Such an interpretation seems to us as unreasonable as it is wasteful. Having found the applicant disabled pursuant to the credible assessments of two of three board-appointed physicians, the board would then be required to expend additional sums to obtain another opinion of disability solely to corroborate a determination the board has already made. We reject any such requirement as a means of avoiding what most jurists seem to agree would be a statutory construction capable of manifest injustice. Rather, we interpret the statute as did the majority in *Coyne*, as requiring three certificates or reports *addressing* the issue of disability. The decision regarding disability is for the board, not any individual physician.

For the foregoing reasons, the judgments of the circuit and appellate courts are reversed, the decision of the Board is set aside, and the cause is remanded to the City of North Chicago Police Pension Board with directions that it grant the plaintiff a line-of-duty pension in accordance with section 3–114.1 of the Illinois Pension Code (40 ILCS 5/3–114.1 (West 2002)).

*Reversed and remanded*
*with directions.*

JUSTICE KILBRIDE took no part in the consideration or decision of this case.