965 N.E.2d 521 (2012)
358 Ill. Dec. 450
The COUNTY OF LAKE and The Lake County Stormwater Management Commission, Plaintiffs and Counterdefendants-Appellees,
v.
CAMPUS INVESTMENTS, INC., and Zero Energy Estates, LLC, Defendants and Counterplaintiffs-Appellants.
No. 2-10-0349.
Appellate Court of Illinois, Second District.
January 27, 2012.
*522 Sebastian Rucci, Attorney at Law, Youngstown, OH, for Campus Investments, Inc., Zero Energy Estates, LLC.
Michael J. Waller, Lake County State's Attorney, Waukegan (Lisle A. Stalter, Assistant State's Attorney, Waukegan, of counsel), and James C. Bakk, Law Offices of James C. Bakk, Waukegan, for County of Lake, Lake County Stormwater Management Commission.

OPINION
Justice HUTCHINSON delivered the judgment of the court, with opinion:
¶ 1 In May 2008, defendants, Campus Investments, Inc., and Zero Energy Estates, LLC, began developing a residential community on an approximately 30-acre parcel of undeveloped land, which included 15 acres of wetland, in the Village of Grayslake (the Village). Plaintiffs, the County of Lake (the County) and the Lake County Stormwater Management Commission (the Commission), subsequently filed a verified complaint seeking injunctive relief, claiming that defendants violated the Lake County Watershed Development Ordinance (amended Oct. 10, 2006) (the ordinance) and the Lake County Highway Access Regulation Ordinance (amended Nov. 12, 2002) (the Highway Access ordinance) by not obtaining the permits required for development of wetlands and use of an access road. Defendants filed a counterclaim and, after a bench trial, the trial court entered a judgment granting a permanent injunction preventing defendants from further developing the property until they obtained the necessary permits and granting other relief. Defendants now appeal, contending that the trial court erred by holding that section 5-1062 of the Counties Code (55 ILCS 5/5-1062 (West 2008)) authorized plaintiffs to regulate wetlands and therefore the injunction was improper. We affirm.

¶ 2 I. BACKGROUND
¶ 3 The County created the Commission pursuant to section 5-1062 of the Counties Code. The Commission consisted of six county board officials and six mayors of municipalities located within the County and was responsible for implementing a countywide system of floodplain and stormwater management. Thereafter, the ordinance was adopted, establishing minimum floodplain and stormwater standards and regulations for the County. As revised, article IV of the ordinance requires a watershed development permit before *523 the commencement of any development that would create a wetlands impact on an area defined as isolated waters within the County.
¶ 4 Campus Investments owned a parcel of undeveloped land located at 21157 West Rollins Road in the Village. Zero Energy Estates was the contract purchaser of the property. The property consists of approximately 30 acres, including 15 acres of wetland. The wetland portion of the property is adjacent to a 316-acre tributary and serves as a natural drainageway for the tributary. On May 24, 2008, defendants began developing the property by bringing in fill material, which was dumped and bulldozed on to the wetland on the property.
¶ 5 On June 20, 2008, plaintiffs filed their verified complaint. Count I alleged that defendants violated the ordinance by failing to obtain a watershed development permit before developing the property. Count I sought injunctive relief, enjoining defendants from further development until they obtained the proper permit and ordering them to restore the filled or impacted wetland. Count II alleged that defendants violated the Highway Access ordinance by using an access road to bring construction equipment to the property without first obtaining a permit to use the access road. Count II sought injunctive relief, enjoining defendants from accessing the property through the access road until they obtained a permit.
¶ 6 On August 26, 2008, defendants answered the complaint, denied the allegations, and asserted three affirmative defenses. On August 28, 2008, defendants filed their verified counterclaim, alleging that the provisions of the ordinance regulating isolated wetlands were improper extensions of the power granted to the County and were therefore unenforceable. The basis of defendants' counterclaim was that section 5-1062 of the Counties Code did not authorize plaintiffs to regulate isolated wetlands within incorporated villages.
¶ 7 A trial commenced on December 9, 2009. The trial record reflects that plaintiffs first called Glenn H. Westman to testify. Westman works for the Commission as a principal wetlands specialist. Westman testified that defendants' development activity impacted approximately 2.8 acres of wetland. Westman further testified that the wetland on the property was approximately 15 acres and that the total wetland, including the area not on the property, was approximately 16.5 acres. Westman testified that he inspected the property on May 27, 2008, because there was a report of earth activity occurring on the property. Westman testified that he took a series of photographs documenting the activity on the property. On cross-examination, Westman acknowledged that the primary benefit of wetlands was providing flood control by storing stormwater. Westman acknowledged that wetlands provided other benefits, such as providing a habitat for wildlife and aesthetic appeal. Westman further acknowledged that, of the 52 municipalities in the County, 14 have a person who is certified by the Commission to review and approve wetlands. The Commission would conduct the review and approval for the other municipalities.
¶ 8 Plaintiffs next called Darcy Hertel, an executive administrative assistant for the Commission. Her responsibilities include handling permit letters and sending out permits. Hertel testified that she was familiar with the subject property because her boyfriend owned farmland in the surrounding area, including across the street. Hertel testified that on May 24, 2008, her boyfriend called, telling her that defendants were unloading bulldozers on the property. Hertel then went to her boyfriend's farm, where she boards a horse, *524 and noticed bulldozers working on the subject property.
¶ 9 Plaintiffs next called Mike Warner, executive director and chief engineer for the Commission. Warner testified that one of the purposes of the Commission was to establish minimum standards for countywide stormwater regulations. Warner testified that pursuant to a Supreme Court decision that changed the Army Corps of Engineers' authority over wetlands, the ordinance was amended to cover wetlands no longer under the jurisdiction of the Army Corps of Engineers. Warner testified that the property was part of tributary consisting of 316 acres, of which 16.5 acres was wetland. The property had 15 acres of wetland located at the base of the tributary. Warner testified that the 16.5 acres of wetland served as a drainageway for surrounding properties. Warner also explained how wetlands benefit drainage systems by acting as sponges and catching and holding stormwater.
¶ 10 Warner further testified that the Village entered into an intergovernmental agreement ceding authority to the Commission to enforce the wetlands provisions of the ordinance. Warner testified that, although the Village was certified to enforce the ordinance, it was not certified to administer the wetlands provisions of the ordinance. According to Warner, the ordinance applied to wetland on the property, because the wetland was isolated waters within the County, the wetland was not under the Army Corps of Engineers' jurisdiction, and the development of the property impacted wetlands. Warner testified that most of the area filled in by defendants on May 24, 2008, was located within the floodplain area.
¶ 11 Plaintiffs next called professor William G. Crumpton, chair of the environmental studies graduate program at Iowa State University. Crumpton testified that he visited the property and observed the tributary that drains through the wetland. Crumpton testified that the wetland served to lessen the peak flows during a storm or flood. Crumpton further testified that the wetland, including the 15 acres on the property, served that function.
¶ 12 Defendants offered the testimony of Gregory Waller, president of Campus Investments. Waller testified that an engineering firm he hired obtained approval from the Village for a soil stockpile plan on the property. Waller testified that it was his goal to maximize the lot size of the property to increase its economic value. Waller testified that defendants intended to use roughly one-half of the property's 30 acres and preserve the other half. Waller further testified that there was some discrepancy between his engineers' and the Commission's base flood elevations. Waller testified that defendants planned to comply with any stormwater requirements.
¶ 13 Defendants also called Gerald Conrad. Conrad testified that he had extensive experience in government entitlement, land acquisition, and planning new residential communities. Conrad testified that he was very active in working against the passage of isolated wetlands regulation in Illinois and did not believe that the state had authority to pass such legislation. Conrad testified that the impact of wetlands presented a financial burden for homebuilders.
¶ 14 Defendants next recalled Warner as an adverse witness. Warner denied that modifications to existing wetlands could not be made, stating that modifications were permitted so long as there was mitigation of the impact that would result from the modifications.
¶ 15 Following closing arguments, the trial court issued an oral ruling that was *525 incorporated into its March 16, 2010, judgment in favor of plaintiffs. In its oral ruling, the trial court initially noted that the gravamen of defendants' argument was that, although wetlands provided some flood control benefits, plaintiffs' true motivation in adopting article IV of the ordinance was to preserve wetlands for environmental and natural resource purposes as opposed to flood control purposes. Pursuant to the evidence presented, the trial court found that wetlands provide a number of stormwater functions, such as evapotranspiration of stormwater, slowing downstream rates of stormwater, allowing stormwater to infiltrate the ground to become absorbed and thereby reducing the volume of flood waters, providing peak flow attenuation during storm events, providing overall stormwater volume reduction, and removing sediment from stormwater, which could block or clog flood control mechanisms downstream. Regarding the wetland on the property, the trial court found that the wetland was a catchment site that accepted waters flowing from more than 300 acres and was part of a drainageway.
¶ 16 The trial court noted that it was required to determine whether article IV of the ordinance was "reasonably necessary" to achieve the statutory purposes of stormwater management and flood control, or whether article IV was not "reasonably necessary" because plaintiffs could achieve the same end by adopting other means that did not simultaneously have the benefit of protecting wetlands as an environmental and natural resource. The trial court concluded:
"Although defendants disagree with the manner and regulation of stormwater as adopted by [the ordinance], the [County] is allowed to exercise its judgment and discretion as to the best way to achieve this goal. Unless the method which the [County] chose is manifestly unreasonable, the [trial court] should not interfere with it. Likewise[,] the issue is not whether [defendants] might reasonably disagree with the [County's] method of regulating or even whether [the trial court] agrees that the [County] chose the best method of regulating.
Given the undisputed testimony in this case that wetland regulations serve a real and substantial flood control benefit, the fact that the [County] may have chosen other means to regulate the problem is not enough to render [article IV of the ordinance] manifestly unreasonable."
The trial court then entered a permanent injunction against Campus Investments preventing all development on the property until the required approval and permits were obtained. The trial court also ordered Campus Investments to restore the property to the topographical condition existing prior to May 24, 2008. The trial court fined Campus Investments $30,000 for violating the ordinance. Defendants timely appealed.

¶ 17 II. DISCUSSION
¶ 18 On appeal, defendants assert that the trial court erred when it concluded that the wetlands provisions of the ordinance were authorized by the Counties Code. Defendants raise several arguments in support of this contention, including that section 5-1062 does not permit plaintiffs to regulate isolated wetlands located within incorporated villages, that managing wetlands is not a "necessary implication" of the Counties Code, and that the wetlands provisions of the ordinance are inconsistent with the purpose of section of 5-1062. Plaintiffs counter that the Counties Code expressly provides for the management of wetlands because wetlands, both in general and on the property, constitute a basin and the evidence at trial established that the *526 wetlands served as a drainageway for stormwater. Plaintiffs further argue that defendants failed to demonstrate that the Commission was exercising extraterritorial jurisdiction.
¶ 19 We begin our analysis with the well-settled maxim that a county is a creature of the state and can exercise only powers that are delegated by the legislature or that arise from a necessary implication of an expressly granted power. Inland Land Appreciation Fund, L.P. v. County of Kane, 344 Ill.App.3d 720, 724, 279 Ill.Dec. 649, 800 N.E.2d 1232 (2003). Powers statutorily granted to a local governmental entity should be strictly construed against the governmental entity and should not be enlarged by liberal construction of the statute granting the authority. Accordingly, our resolution of this case requires an interpretation of section 5-1062 of the Counties Code and a determination of whether the statute expressly authorizes the wetlands provisions of the ordinance, whether those provisions are a necessary implication of the Counties Code, or neither.
¶ 20 The primary objective of statutory interpretation is to give effect to the intent of the legislature, and the most reliable indicator of legislative intent is the language of the statute given its plain, ordinary, and popularly understood meaning. Gardner v. Mullins, 234 Ill.2d 503, 511, 334 Ill.Dec. 617, 917 N.E.2d 443 (2009). When determining the meaning of a statute, it "`should be read as a whole with all relevant parts considered.'" Id. (quoting Kraft, Inc. v. Edgar, 138 Ill.2d 178, 189, 149 Ill.Dec. 286, 561 N.E.2d 656 (1990)). If the statutory language is clear, a reviewing court does not need to resort to extrinsic aids of construction, such as legislative history. Northern Kane Educational Corp. v. Cambridge Lakes Education Ass'n, IEA-NEA, 394 Ill.App.3d 755, 758, 333 Ill.Dec. 474, 914 N.E.2d 1286 (2009). In such a situation, a court may not depart from the plain language of the statute and read into it exceptions, limitations, or conditions that are inconsistent with the express legislative intent. Landheer v. Landheer, 383 Ill.App.3d 317, 321, 322 Ill.Dec. 684, 891 N.E.2d 975 (2008). Nonetheless, when reviewing a statute, we also consider the subject it addresses and the legislature's apparent objective in enacting it, and we presume that the legislature did not intend to create absurd, inconvenient, or unjust results. Fisher v. Waldrop, 221 Ill.2d 102, 112, 302 Ill.Dec. 542, 849 N.E.2d 334 (2006). The construction of a statute presents a question of law, which we review de novo. Wade v. City of North Chicago Police Pension Board, 226 Ill.2d 485, 510-11, 315 Ill.Dec. 772, 877 N.E.2d 1101 (2007).
¶ 21 The legislature expressly identified the purpose of section 5-1062 of the Counties Code, which is "to allow management and mitigation of the effects of urbanization on stormwater drainage in metropolitan counties located in the area served by the Northeastern Illinois Planning Commission." 55 ILCS 5/5-1062(a) (West 2010). Section 5-1062 seeks to achieve this purpose by consolidating stormwater management into a countywide structure, setting minimum standards for floodplain and stormwater management, and preparing a countywide plan to manage stormwater runoff, including management of natural and man-made drainageways. 55 ILCS 5/5-1062(a)(1), (a)(2), (a)(3) (West 2010). The section provides that a stormwater management planning committee shall be established through a county board resolution (55 ILCS 5/5-1062(b) (West 2010)) and that a county may enact ordinances prescribing "reasonable rules and regulations for floodplain management and for governing the location, *527 width, course and release rate of all stormwater runoff channels, streams and basins in the county, in accordance with the adopted stormwater management plan" (55 ILCS 5/5-1062(f) (West 2010)).
¶ 22 The ordinance was adopted pursuant to section 5-1062 and was broadly intended to protect against flood damage by creating rules and regulations for development, including regulations to ensure that development does not increase flood and drainage hazards to others or create unstable conditions susceptible to erosion. Lake County Watershed Development Ordinance, art. I (amended Oct. 10, 2006). The ordinance defines floodplain management as "[an] overall program of corrective and preventative measures for avoiding or reducing future flood damage." Lake County Watershed Development Ordinance, app. A (amended Oct. 10, 2006). Article IV of the ordinance provides that "[n]o person, firm, corporation or governmental agency shall commence any development regulated by this [o]rdinance on any lot or parcel of land without first obtaining [a watershed development permit from the commission]." Lake County Watershed Development Ordinance, art. IV(A)(1) (amended Oct. 10, 2006). Article IV further specifies that a permit is necessary for a development that, inter alia, creates a wetlands impact, is located in a regulatory floodplain, or is located in a flood-prone area. Lake County Watershed Development Ordinance, art. IV (amended Oct. 10, 2006).
¶ 23 Construing section 5-1062 of the Counties Code, it is evident that the legislature intended for counties subject it to have broad authority to adopt countywide mechanisms to address floodplain and stormwater management. The purpose of section 5-1062, as reflected by the plain and ordinary meaning of the express language used in the statute, is to allow the designated counties to manage and mitigate the effects of urbanization on stormwater management on a countywide basis. Section 5-1062(f) seeks to effectuate this purpose by authorizing a county board to "prescribe by ordinance reasonable rules and regulations for floodplain management and for governing the location, width, course and release rate of all stormwater runoff channels, streams and basins in the county." (Emphasis added.) 55 ILCS 5/5-1062(f) (West 2010). This provision has two parts and expressly authorizes a designated county to perform two specific acts. The first part of section 5-1062(f) expressly authorizes a county to adopt reasonable rules and regulations relating to "floodplain management." The second part of section 5-1062(f) authorizes a county board to adopt further regulations governing the location, width, course, and release rate for all stormwater channels, streams, and basins. Contrary to defendants' assertion, the authority granted by this provision is not limited to unincorporated areas within a county, and we are not permitted to read into the statute a limitation not expressed by our legislature, when doing so would be contrary to the purpose of the statute. See Landheer, 383 Ill.App.3d at 321, 322 Ill.Dec. 684, 891 N.E.2d 975. As noted above, the purpose of section 5-1062 is to enable designated counties to mitigate the effects of urbanization on stormwater drainage by giving those counties the ability to establish countywide structures to regulate stormwater and floodplains. Restricting section 5-1062(f) to apply only to unincorporated areas within a county would undermine that express purpose by inhibiting a county's ability to adopt countywide regulations related to floodplains. Such a limitation would allow the county to regulate only certain areas within the county, i.e., unincorporated areas.
¶ 24 Having concluded that the express intent of section 5-1062 is to give designated *528 counties broad authority to adopt ordinances for stormwater and floodplain management, we further conclude that regulating wetlands fits within the commonly understood meaning of "floodplain management." A "floodplain" is commonly defined as "level land that may be submerged by floodwaters." Webster's Ninth New Collegiate Dictionary 474 (1988). We further note that the Commission's definition of floodplain management is consistent with the Federal Emergency Management Agency's definition, which defines "floodplain management" as a series of corrective and preventative measures to reduce flood damage (http://www.fema. gov/plan/prevent/floodplain/index.shtm). More important, as the trial court concluded, the evidence at trial reflected that wetlands are integral to reducing flood damage because they provide a number of benefits related to reducing damage caused by flooding. For example, Warner testified that the wetland on the property was part of a 300-plus-acre tributary and that it served as a drainageway for surrounding properties. Warner further testified that wetlands reduce flooding by catching and absorbing stormwater. Crumpton testified that wetlands, including the wetland on the property, serve to lessen the peak flows during a storm or flood. Thus, the undisputed evidence adduced at trial clearly demonstrates that the benefits of wetlands include slowing downstream runoff rates of stormwater and providing overall stormwater volume reduction. Because wetlands reduce flooding by serving as catchways for floodwater and lessening the peak flows during a storm or flood, among other benefits, regulation of wetlands fits within the commonly understood meaning of "floodplain management." Therefore, pursuant to section 5-1062(f), the County was authorized to enact reasonable regulations relating to wetlands.
¶ 25 Moreover, we reject defendants' argument that plaintiffs violated sections 5-1062(j) and (k) of the Counties Code, respectively. Subsection (k) of section 5-1062 provides:
"Upon petition of the municipality, and based on the finding of the stormwater management planning committee, the county shall not enforce rules and regulations adopted by the county in any municipality * * * that has a municipal stormwater management ordinance that is consistent with and at least as stringent as the county plan and ordinance, and is being enforced by the municipal authorities." 55 ILCS 5/5-1062(k) (West 2008).
This provision expressly provides that a municipality can retain control of stormwater management should it adopt its own regulations consistent with the county plan and ordinance. However, the record undisputedly reflects that the Village was not certified to administer the wetlands provisions of the ordinance. Thus, subsection (k) does not prevent plaintiffs from enforcing the wetland provisions of the ordinance, because the Village was not certified to enforce those provisions. In addition, we reject defendants' argument that plaintiffs violated subsection (j) of section 5-1062, which permits a county to inspect lands after 10 days' notice "for the purpose of inspecting stormwater facilities or causing the removal of any obstruction to an affected watercourse." 55 ILCS 5/5-1062(j) (West 2008). Defendants' maintain that plaintiffs entered the property without giving proper notice. However, Westman's testimony reflects that he inspected the property on May 27, 2008, after defendants began filling in the land without a proper permit. The purpose of his visit was to investigate the activity on the land, not to investigate stormwater facilities or cause the removal of an obstruction to a watercourse. Further, there is no indication *529 that defendants objected to the inspection when it occurred, and the record further reflects that defendants did not request any relief for the alleged violation of section 5-1062(j) or plead any facts to support such relief in their verified counterclaim. See Pioneer Trust & Savings Bank v. Zonta, 74 Ill.App.3d 614, 618, 30 Ill.Dec. 512, 393 N.E.2d 548 (1979) (holding that defendant's argument that a lease should be rescinded because of the zoning prohibition was made too late because such a remedy was never requested at trial nor were facts pleaded that would attest to the right to such relief). Finally, we reject defendants' argument that the $920 fee charged for an impact letter was improper because it was not provided for in the ordinance. Article IV provides that "[a] schedule of fees in accordance with the provisions of [the ordinance] shall be established by separate resolution of the [Commission]." Lake County Watershed Development Ordinance, art. IV(A)(5) (amended Oct. 10, 2006).

¶ 26 III. CONCLUSION
¶ 27 We conclude that section 5-1062(f) of the Counties Code expressly authorized plaintiffs to adopt reasonable regulations pertaining to floodplain management, including the regulation of wetlands. The undisputed evidence presented reflects that wetlands are integral to reducing flood damage, and therefore the regulations fit within the statutory definition of floodplain management. Accordingly, we affirm the judgment of the circuit court of Lake County.
¶ 28 Affirmed.
Presiding Justice JORGENSEN and Justice BOWMAN concurred in the judgment and opinion.