2020 IL App (1st) 192032-U

SIXTH DIVISION
April 24, 2020

No. 1-19-2032

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| KIMBERLY NELSON, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | Appeal from the |
| | ) | Circuit Court of |
| v. | ) | Cook County. |
| | ) | |
| THE RETIREMENT BOARD OF THE POLICEMEN'S | ) | |
| ANNUITY AND BENEFIT FUND OF THE CITY OF | ) | No. 18 CH 12877 |
| CHICAGO; KENNETH HAUSER, President; CAROL | ) | |
| HAMBURGER, Vice President; BRIAN WRIGHT, | ) | |
| Secretary; CAROLE BROWN, HEYDEE CALDERO, | ) | Honorable |
| KURT SUMMERS, THOMAS BEYNA, EDWARD | ) | Anna Loftus, |
| WODNICK, Members of the Board, and REGINA | ) | Judge Presiding. |
| TUCZAK, Executive Director, | ) | |
| | ) | |
| Respondents-Appellees. | ) | |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Cunningham and Harris concur in the judgment.

## O R D E R

¶ 1    *Held*: Administrative decision granting an ordinary disability benefit set aside where officer developed posttraumatic stress disorder when she responded to an armed robbery call, radioed the dispatcher three to four times, stated it was an emergency, and received no response.

¶ 2     Former Chicago police officer Kimberly Nelson applied for a duty disability benefit after she was no longer able to work following an incident where she responded to an armed robbery and failed to receive appropriate support from her dispatcher. After a hearing, the Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago (Board) awarded Ms. Nelson only an ordinary disability benefit. Ms. Nelson sought administrative review and the circuit court affirmed the Board's decision. For the following reasons we set aside the Board's decision and order that Ms. Nelson be awarded a duty disability benefit.

¶ 3                               I. BACKGROUND

¶ 4     On August 30, 2018, the Board held a hearing on Officer Nelson's application for a duty disability benefit. Officer Nelson, who had worked for the Chicago Police Department (Department) since 2002, argued that she was no longer able to continue in her position after an incident occurred on December 8, 2016, from which she claimed to have developed posttraumatic stress disorder (PTSD). The following information comes from Officer Nelson's testimony given during the hearing, her accompanying certified statement, and exhibits offered into evidence at the hearing.

¶ 5     On December 8, 2016, Officer Nelson was on duty, assigned to Beat 652, in her patrol car by herself when a dispatcher radioed that there was a "possible kidnapping of a FedEx driver" on 80th Street. Officer Nelson responded to the call, inquiring where exactly on 80th Street the incident had occurred. Eventually, the dispatcher replied, "Units in 6, we have a robbery, an armed robbery of a FedEx driver, 708 East 80th." Officer Nelson, who was nearby, headed to the location while calling "652 for information." Officer Nelson's call went unanswered. Once on 80th Street, Officer Nelson spotted a FedEx truck, which prompted her to call in "652, emergency." She testified that she again received no response. She testified that she called a total of three to four

times with no response.

¶ 6    Officer Nelson stated, "I was at—now pulling up at [the] FedEx truck with absolutely no response from my dispatcher, no information, no further information regarding the offender, regarding the gun, regarding the victim nothing, and I sat there on scene not believing that I had gotten no response" and that "I was in the car and my world closed in." She further explained this feeling as "kind of like looking in a peephole of a door *** [i]t was small *** I just didn't know what was going on" and said that she "felt abandoned during a heightened sense of danger."

¶ 7    Officer Nelson then spotted a man in a FedEx uniform, later identified as the victim of the armed robbery, running towards her car. She relayed that information to her dispatcher and, according to Officer Nelson, "[a]fter an extraordinary amount of time, the dispatcher responded saying, '652 may have the victim.' " The FedEx driver got in the passenger-side door of the police vehicle and reported to Officer Nelson that someone held a gun to his head and that he feared for his life. Officer Nelson took the victim to a safe location where he provided her with more information about the incident.  She sent information about the offender and the possible direction of flight to the dispatcher. She and the victim then began touring the area in search of the offender. They then returned to the scene and Officer Nelson again called dispatch and again received no response. She tended to the victim, who was upset at the scene, and called dispatch. This time she received a response that she described as "cold." She reported to dispatch that she was returning to the station, which she did. When she returned to the station, she asked a superior, Sergeant Virginia Bucki, if she had "heard the dispatchers ignoring my calls and my emergency calls." Officer Nelson testified that Sergeant Bucki stated she heard nothing.

¶ 8    The next day, December 9, 2016, Officer Nelson returned to work where she spoke to Lieutenant Glen White and Sergeant Richard Turrise about the incident. Officer Nelson testified

that Lieutenant White said he had not heard her over the radio and Sergeant Turrise said she should have "pressed the emergency button" if she had an emergency, to which Officer Nelson replied, "I didn't have a computer in my car, so I couldn't press the button." Officer Nelson stated that she "resigned [herself] to believe that maybe no one heard [her]." However, after this conversation with her superiors, Officer Nelson said she encountered "a PPO who normally worked for Beat 614" who told her that he had heard her radio calls. She was unable to find this person again.

¶ 9     Officer Nelson was assigned to the same beat on December 9, and, as she passed the area of the robbery on her patrol, she "experienced nausea" and "tightness in [her] chest." She pulled over and called dispatch who called the paramedics. Officer Nelson was then taken to the University of Chicago Hospital where she was told to follow up with her primary care doctor. She has not returned to work since.

¶ 10     Officer Nelson testified that she began therapy following the incident and, as of the hearing, was taking 20 milligrams of Lexapro (an antidepressant) daily. She testified that she felt she could never return to her job at the Department. Officer Nelson also stated in her certified statement that when she reviewed "[her] narrative report" from the incident, she "discovered that the first lines of the report, detailing [her] two or three calls to the dispatcher and [her] two emergency calls, had been deleted" and that the description of her "contact and interaction with the victim had been altered from [her] original report."

¶ 11     Psychological evaluations determining Officer Nelson's fitness for duty were offered as exhibits at the hearing, including two evaluations Officer Nelson underwent several years prior to the incident in question. Dr. Michael E. Bricker, supervised by Dr. Marva Dawkins, interviewed Officer Nelson on May 14, 2012, about four-and-a-half years prior to the incident described above. At that time, Officer Nelson had been referred for a fitness of duty evaluation by the Department

"after she became overwhelmed with emotion while on duty, resulting in her becoming tearful and requesting to be relieved from duty" and because she "displayed some emotional instability in the presence of her sergeant and other officers and had also relinquished her service weapon to her superior as a result of her emotionality." Dr. Bricker noted that Officer Nelson was "experiencing anxiety about being in the workplace." She described being "picked on" by her fellow officers, observed them "gossiping" about her, and felt excluded. Dr. Bricker determined Officer Nelson was unfit for duty at that time because "test data does suggest that the officer may be experiencing some poor interpersonal adjustment, which could adversely affect her performance of job functions" and Officer Nelson's "report of mental health symptoms, coupled with her reported coping deficits suggest she remains in an emotionally fragile state, prone to decompensation." It is unclear from the record precisely when Officer Nelson returned to work at the Department following these 2012 evaluations.

¶ 12    On May 20, 2014, Dr. Sara Michelson evaluated Officer Nelson when she was again referred for evaluation after being diagnosed with an anxiety disorder. During the interview, Officer Nelson discussed feeling isolated at work and reported two incidents where coworkers said "inappropriate" things to her or in front of her. She further stated she was " 'too affected' by her work environment to maintain basic safety precautions." However, after beginning therapy in March 2014, Officer Nelson felt she developed better coping mechanisms and Dr. Michelson determined she was fit for duty. There was no evidence in the record of any psychological issues after the May 20, 2014, evaluation and the attendance records from 2016 reflect that prior to the December 8, 2016, incident, Officer Nelson only missed work in August for eye surgery and two days in May for an upset stomach.

¶ 13    After the December 8, 2016, incident with the FedEx driver, several doctors conducted

psychological evaluations to determine whether Officer Nelson was fit for duty. Dr. Dawkins, who had been asked to evaluate Officer Nelson for the Department, evaluated her three times, concluding each time that she was unfit for duty. In her report from May 5, 2017, Dr. Dawkins noted, "Officer Nelson believes she has been singled out as an unfit officer by certain unknown individuals from the time she was a recruit to the present. She recounts numerous incidents in which she was 'set up' to appear unable to perform her duties. She feels she has been targeted by others in the department and set up to fail *** she expresses that she has been emotionally overwhelmed trying to cope with such negative intrusions of others." Dr. Dawkins further noted that "[d]ocuments provided by the department suggest[ed] Officer Nelson ha[d] longstanding psychological issues including the display of emotional outbursts while on duty." Dr. Dawkins determined that Officer Nelson was unfit for duty "as she [was] too preoccupied with the events of the December 8, 2016[,] incident as well as similar occurrences throughout her career."

¶ 14    Dr. Dawkins interviewed Officer Nelson again on July 23, 2017, and again determined that Officer Nelson was unfit for duty. This time Dr. Dawkins stated that Officer Nelson was "suffering from Post-Traumatic Stress Disorder *** complicated by longstanding characterological issues involving trust and a strong belief system of being targeted by the department as being an unfit officer." She also stated that Officer Nelson's PTSD could be "directly attributed to the on-duty events which occurred from the incident in December 2016." Dr. Dawkins also noted that Officer Nelson's "[s]ymptoms ha[d] intensified as her belief system ha[d] become more ingrained that she [was] being targeted by the department to be fired."

¶ 15    In a final evaluation conducted on November 9, 2017, Dr. Dawkins determined that Officer Nelson was still unfit for duty and "had longstanding psychological issues that were exacerbated by the incident in December of 2016 *** the incident should be viewed as the catalyst for the

mental break down she [wa]s experiencing." Finally, Dr. Dawkins stated that Officer Nelson's condition has worsened over the past year, likely "due in large part to the department not accepting her version of the events of the robbery incident."

¶ 16    Dr. Alan Hirsch conducted a psychological evaluation of Officer Nelson on February 12, 2018, apparently at the request of the Board. His conclusion was that she was not disabled. He noted that her "description of what happened [on December 8, 2016] continued to change as she repetitively presented it." Dr. Hirsch stated in his report "[i]t is my medical opinion that she does not currently meet criteria for PTSD because of a number of different conditions including lack of pervasive involvement in life as well as lack of a primary event that would have been considered to be traumatic for most people" and "there is substantial reason to suspect that either malingering or another condition is occurring that she is refusing to reveal."

¶ 17    A letter from Dr. Robert Passavoy was included in the evidence before the Board. Dr. Passavoy stated that "[o]n December 8, 2016, Officer Nelson was involved in a high stress situation involving armed robbery, essentially without backup" and that "the stress of the event has resulted in some stress-related problems." Dr. Terry Finn, after conducting a psychological evaluation, concluded that Officer Nelson "is unfit for duty due to her post traumatic stress disorder occurring on duty December 8, 2016." Finally, Dr. Andrei Pankov, who had been treating Officer Nelson since August 17, 2017, stated on a questionnaire that he prescribed Officer Nelson Lexapro, and that she "experienced a traumatic event at work" on December 8, 2016, and she has not been able to work since. The questionnaire was not dated.

¶ 18    The Board's written decision detailed its findings of fact. The Board noted that Officer Nelson underwent two psychological evaluations prior to the incident where she described being "picked on" by her fellow officers and being the target of gossip and an "inappropriate" comment

about suicide. The Board found that after the incident, Dr. Dawkins determined that Officer Nelson was unfit for duty because she was "emotionally overwhelmed and had an outpouring of emotions while on duty centered around the December [8], 2016, events in which Nelson alleged her account of events contradicted the department['s] version and that her report had been altered," that "she had been singled out as being an unfit officer since she was a recruit and had concerns since she was a recruit about how she was being viewed by others in the department," that she felt "she ha[d] been targeted by others in the department and 'set up' to fail," and that Officer Nelson had "longstanding psychological issues including the display of emotional outbursts while on duty." The Board also noted Dr. Dawkins's conclusion that Officer Nelson "suffers from PTSD, attributable to the December 2016 events and which is complicated by longstanding mental problems in which [Officer] Nelson has come to believe over the years that the department has conspired to make her appear inept and to accuse her of wrongdoing so she could be fired." Finally, the Board acknowledged that Dr. Hirsch determined that Officer Nelson did not meet the criteria for PTSD.

¶ 19   Regarding the December 2016 incident, the Board determined that Officer Nelson:

"[A]t no point in time ever came upon the alleged offender. Rather, the only individual [she] had [an] interaction with during the incident was the FedEx employee. As such, [Officer] Nelson was not, as she claims, in any real or reasonably perceived danger during the incident, and therefore was not involved in any act of police duty inherently involving special risk."

¶ 20   Because of Officer Nelson's repeated issues with coworkers, the Board finally concluded that her "disabling condition is not the result of an identifiable act of duty incident" but rather:

"is a result of her perceived unconfirmed mishandling by the [Department] of the events

surrounding the December 8, 2016, incident, which was further exasperated by her longstanding and documented history of issues with emotional and psychological distress associated with her perception and conjecture of how she was being treated and viewed by others within the [Department]."

¶ 21   On why it was awarding her an ordinary disability benefit, rather than a duty disability benefit, the Board specifically stated:

"[Officer] Nelson's medical condition is disabling which entitles her to a disability benefit. The Board further finds that [Officer] Nelson, by her self-serving testimony, has not met her burden of proving her disability is the result of an identifiable act of duty incident, but rather is the result of a long-standing and continuing issue concerning her perception of the [Department]'s failure to respond in a manner she feels is appropriate and how others within the [Department] view her. [Officer] Nelson's application for a duty disability benefit is therefore denied, and [Officer] Nelson is granted an ordinary disability benefit[.]"

¶ 22   Ms. Nelson filed a complaint for administrative review of the Board's decision in the circuit court and, on July 15, 2019, the circuit court affirmed the Board's decision. Ms. Nelson filed a motion to reconsider that ruling, arguing for the first time that the administrative record was incomplete because it did not include an arbitration award from April 30, 2018. The arbitration was filed by the Fraternal Order of Police, on behalf of Officer Nelson. It was filed against the Department and the City of Chicago, claiming that Ms. Nelson should be granted "injury on duty" disability income, which the Chicago Committee on Finance originally denied her. The arbitrator found Ms. Nelson's "injury arose [] out of her employment as a police officer" and ordered the Department to certify [her] injury as an 'injury on duty' " for the purpose of granting her disability income. The circuit court denied the motion to reconsider on September 11, 2019.

¶ 23    Ms. Nelson now appeals.

¶ 24                             II. JURISDICTION

¶ 25    The circuit court entered its final judgment in this case on September 11, 2019, and Ms. Nelson filed her timely notice of appeal on October 4, 2019. This court has jurisdiction pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 26                             III. ANALYSIS

¶ 27    On appeal, Ms. Nelson argues that (1) the Board was bound by the arbitration decision and (2) the Board erred in awarding her an ordinary disability benefit. We address each issue in turn.

¶ 28             A. The Board is Not Bound by the Arbitration Decision

¶ 29    Ms. Nelson argues that the arbitration decision concerning the nature of her disability benefits—and specifically the requirement that the Department certify her injury as an "injury on duty"—controls the nature of the disability pension she should receive. Although Ms. Nelson does not make this argument very clearly, it appears that she is arguing that the arbitration award, which was never appealed, collaterally estops the Board from finding that she was not injured during an "act of duty."

¶ 30    As we have repeatedly recognized:

> "Collateral estoppel, also referred to as issue preclusion, will prevent a party from relitigating an issue if the following elements are present: (1) the issue decided in the prior litigation is identical to the one presented in the current case, (2) there was a final adjudication on the merits in the prior case, and (3) the party against whom estoppel is asserted was a party to, or in privity with a party to, the prior litigation." *Pine Top Receivables of Illinois, LLC v. Transfercom, Ltd.,* 2017 IL App (1st) 161781, ¶ 8.

¶ 31   The Board responds that the arbitration decision was not submitted to the Board during its hearing and is therefore not a part of the record on appeal. The Board further argues that receiving an "injury on duty," as that phrase is used in a collective bargaining agreement, is not the same as being injured during an "act of duty" under the Pension Code.

¶ 32   The Illinois Pension Code (Pension Code) (40 ILCS 5/1-101 *et seq.* (West 2016)) defines an "act of duty" as "[a]ny act of police duty inherently involving special risk, not ordinarily assumed by a citizen in the ordinary walks of life." 40 ILCS 5/5-113 (West 2016). The Board argues that, conversely, an "injury on duty," is much broader, encompassing any injury incurred at work.

¶ 33   We have no way of evaluating the Board's argument that "injury on duty" under the collective bargaining agreement is broader than "act of duty" under the Pension Code since neither the collective bargaining agreement nor any record of the arbitration proceedings, apart from the arbitration award, is included in the record on appeal. However, even if, as Ms. Nelson contends, the two terms are equivalent and the parties to the arbitration are considered to be in privity with the parties in this pension hearing, Ms. Nelson's collateral estoppel argument fails because she raised this argument for the first time on administrative review and even then, not until she filed a motion to reconsider. A party who fails to raise a claim of collateral estoppel, or issue preclusion, forfeits that claim. *People v. Sevedo*, 2017 IL App (1st) 152541, ¶ 42. "Issues or defenses not placed before the administrative agency will not be considered for the first time on administrative review." *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 278 (1998). Moreover, "[a]rguments raised for the first time in a motion for reconsideration in the circuit court are forfeited on appeal." *Evanston Insurance Co. v. Riseborough,* 2014 IL 114271, ¶ 36. Thus, Ms. Nelson has forfeited any collateral estoppel argument and the Board was not bound by the

11

arbitration decision.

¶ 34        B. Ms. Nelson's Injury Occurred in the Performance of An Act of Duty

¶ 35    Ms. Nelson's primary argument on appeal is that the Board's finding that she is not disabled because of an injury that occurred in the performance of an act of duty was against the manifest weight of the evidence. While we understand our obligation to defer to the Board on its findings of fact, in this case we agree with Ms. Nelson that the Board's factual findings are against the manifest weight of the evidence.

¶ 36    Under the Pension Code, an ordinary disability benefit will be granted when:

"A policeman less than age 63 who becomes disabled after the effective date as the result of any cause other than injury incurred in the performance of an act of duty, shall receive ordinary disability benefit during any period or periods of disability exceeding 30 days, for which he does not have a right to receive any part of his salary." 40 ILCS 5/5-155 (West 2016).

The amount of an ordinary disability benefit is 50% of the officer's salary. 40 ILCS 5/5-155 (West 2016).

¶ 37    Conversely, a duty disability benefit is granted when:

"An active policeman who becomes disabled on or after the effective date as the result of injury incurred on or after such date in the performance of an act of duty, has a right to receive duty disability benefit during any period of such disability for which he does not have a right to receive salary, equal to 75% of his salary, as salary is defined in this Article, at the time the disability is allowed." 40 ILCS 5/5-154 (West 2016).

¶ 38    As stated above, an act of duty is defined by the Pension Code as:

"Any act of police duty inherently involving special risk, not ordinarily assumed by a

citizen in the ordinary walks of life, imposed on a policeman by the statutes of this State or by the ordinances or police regulations of the city in which this Article is in effect or by a special assignment." 40 ILCS 5/5-113 (West 2016).

¶ 39    The decision that we are reviewing is that of the Board. "In administrative cases, we review the decision of the administrative agency, not the determination of the circuit court." *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 504-05 (2007). We defer to the Board, particularly on its factual findings: "Rulings on questions of fact will be reversed only if they are against the manifest weight of the evidence." *Id.* Both the Board and Ms. Nelson agree that the Board's decision turns on a question of fact—whether Ms. Nelson was injured in the performance of an act of duty—and should be reviewed under the manifest weight of the evidence standard. *Id.* at 504-05; *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 534 (2006). "An administrative agency decision is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Wade*, 226 Ill. 2d at 504 (quoting *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992)).

¶ 40    The Board set out its factual findings in its written decision. After reviewing the evidence presented at the hearing, the Board determined "as a matter of fact" that Ms. Nelson was "emotionally incapable" of returning to work and entitled to a disability benefit, but that she "ha[d] not met her burden of proof that her disabling condition was incurred while in the performance of an act of duty." The Board noted that she never "came upon the alleged offender," was not in any real or reasonably perceived danger, and "therefore was not involved in any act of police duty inherently involving special risk." The Board also noted that Ms. Nelson "has a longstanding and documented history of issues with emotional and psychological distress associated with her perception of how she was being viewed by others" in the Department. The Board therefore

13

concluded that Officer Nelson's "disabling condition is a result of her perceived, unconfirmed mishandling by the [Department] of the events surrounding the December 8, 2016, incident, which was further exasperated by her longstanding and documented history of issues with emotional and psychological distress associated with her perception and conjecture of how she was being treated and viewed by others within the [Department]."

¶ 41    Ms. Nelson argues that "responding to a dispatcher's call of an armed robbery in a high crime area is a 'police duty inherently involving special risk, not ordinarily assumed by a citizen in the ordinary walks of life.' " Ms. Nelson also contends that the Board's determination that her disability is due to "longstanding" psychological issues is misguided, where she had not missed a single day of work in the six-month period leading up to the incident, and in fact, the first day of work Ms. Nelson missed due to any psychological issues in 2016 was on December 9.

¶ 42    We agree with Ms. Nelson that the injury she experienced was in her performance of an act of police duty. She was on duty, responding to the call of a violent crime, when the trauma of her fear and the lack of support from her dispatcher caused her to experience PTSD. Regardless of whether she ever encountered the alleged offender, she was experiencing the special risks of police duty when she suffered the trauma that lead to her disability.

¶ 43    Although the Board dismisses Ms. Nelson's testimony as "self-serving," no other testimony presented at the hearing called into question her version of events. We also agree with Ms. Nelson that the record demonstrates that any "longstanding" psychological issues that Ms. Nelson may have had were under control since she had missed no work due to these issues for many months prior to this incident. Moreover, the fact that Ms. Nelson may have been particularly susceptible to PTSD does not change the fact that the cause of her current condition was the events of December 8, 2016.

14

¶ 44    As the Board itself notes, there is no debate as to whether Ms. Nelson has been disabled since the December 2016 incident. The only issue before us is whether her disability is the result of her performance of an act of duty. Dr. Dawkins testified that Ms. Nelson's PTSD could be "directly attributed to the on-duty events which occurred from the incident in December 2016." Dr. Finn also determined that Ms. Nelson was "unfit for duty due to her post-traumatic stress disorder occurring on duty December 8, 2016." Dr. Hirsch, who concluded that Ms. Nelson was not disabled and did not "meet the criteria for PTSD and there is substantial reason to suspect that either malingering or another condition is occurring that she is refusing to reveal," met Ms. Nelson only one time and his findings were clearly not accepted by the Board since, as stated above, the Board does not question whether Ms. Nelson has a disability, only whether it was caused by an act of duty.

¶ 45    An officer's entitlement to duty disability benefits, like an officer's right to a line-of-duty disability pension, turns on whether the officer's injury leading to a disability occurred during an "act of duty" as defined under section 5-113 of the Pension Code (40 ILCS 5/5-113 (West 2016)). See 40 ILCS 5/3-114.1 (West 2016). Ordinary job stressors, such as frustration over lack of career advancement, do not generally qualify an officer for a duty disability benefit. *Wall v. Police Pension Board*, 178 Ill. App. 3d 438 (1998). And "[c]ourts deny line-of-duty disability pensions where the disability is traceable only to the 'general nature of being a police officer' and not to a specific act of police service, or where the causes of the stress are not unique to police work." *Village of Stickney v. Board of Trustees of Police Pension Fund of Village of Stickney*, 363 Ill. App. 3d 58, 62 (2005) (quoting *Robbins v. Board of Trustees of the Carbondale Police Pension Fund of the City of Carbondale, Illinois*, 177 Ill. 2d 533, 542 (1997)).

¶ 46    However, our supreme court has recognized that police officers often perform acts "which

15

are similar to those involved in many civilian occupations." *Johnson v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 114 Ill. 2d 518, 521 (1986). The court made clear in *Johnson* that the fact that an officer was experiencing something a civilian might also experience does not mean that the police officer is not entitled to a duty disability benefit or pension, rather "[t]he crux is the capacity in which the police officer is acting." *Id.* at 522. Our supreme court in *Johnson* found no support for the "strained construction" that "special risk" under the duty disability statute only encompasses "inherently dangerous" activities. *Id.* at 521. See also *Alm v. Lincolnshire Police Pension Board*, 352 Ill. App. 3d 595, 599 (2004).

¶ 47    Although Ms. Nelson was indisputably performing a police function on December 8, 2016—and an inherently dangerous one at that—the Board denied her a duty disability benefit because her injury was caused at least in part by her coworkers' behavior, rather than strictly from the dangers of police work. But such negative interactions with coworkers, while frequently considered an ordinary job stressor for any worker, can support a duty disability for a law enforcement officer when they occur in the context of the unique stresses of police work.

¶ 48    In *Village of Stickney*, an officer's award of a line-of-duty disability pension was affirmed where the officer, after years of service, began to experience panic attacks as a "result of stress from doing undercover work, a heavy case load, and not having enough protection because of overtime and personnel constraints." 363 Ill. App. 3d 58, 59 (2005). The officer continued to work and three years later, his superior, the chief of police, died, and a new person took over. *Id.* The new police chief denied requests for independent audits, offered the officer cash bonuses for private security jobs, which the officer believed would be improperly paid with public funds, failed to fire an operator who was forging the officer's signature, and, according to the officer's testimony, offered a woman gifts in exchange for filing a rape case against the officer. *Id.* at 59-

60. The officer, whose panic attacks had increased under the new police chief's supervision, stated, "I believe that everything that's happening to me is a direct result of my boss, not because of anything else." *Id.* at 60. Three doctors determined that the officer was disabled and "opined that [his] disability was duty-related." *Id.* In affirming the Board's award of duty disability, this court determined that the "interactions with [the police chief] occurred in the context of [the officer's] police duties" and that these "particular duties were unique to police work and 'not ordinarily assumed by a citizen in the ordinary walks of life' " because "ordinary citizens do not engage in undercover narcotics transactions, are not responsible for the preservation of evidence such as drugs and weapons, and do not investigate rape charges." *Id.* at 66. In short, the officer's interactions with coworkers meant he was facing risks not experienced in civilian life because he was dealing with a supervisor whose treatment of him was undermining his law enforcement work.

¶ 49    Conversely, in *Robbins*, a case the Board relies on to support its position, our supreme court affirmed the Board's denial of a line-of-duty disability pension, reversing the appellate court, where the officer was deemed unfit for duty after experiencing stress following a reassignment to patrol duty. *Robbins*, 177 Ill. 2d at 537. The officer's job stressors stemmed from "(1) his supervisor's criticism of the timeliness and quality of his reports, and (2) his anxiety that his fellow patrol officers were younger and better trained." *Id.* Additionally, the officer witnessed a man shoot himself while on duty. *Id.* Nevertheless, he continued working for another two years, until he injured his hand while on patrol. *Id.* at 537. After his hand healed, he returned to work, but then was put on administrative leave and deemed unfit for duty. *Id.* The supreme court noted that the Board's psychologist concluded that the officer's stress was not related to any specific act as a police officer, but instead to general work stress, and that his own psychologists supported this theory. *Id.* at 544. Indeed, his psychologist determined that the officer's "past exposure to

17

occasional violence was not problematic for him" but that "[h]is continuous exposure to possible violence, as well as the pace of his duties in general, were of considerable stress." *Id.* The court was clear that "generalized police stress of multiple origins" does not equate to an act of duty and found that "this record contains ample evidence that [the officer's] stress was the result of his anxiety over his job performance, which civilians regularly suffer, and not the performance of a specific act of duty." *Id.* at 543-44.

¶ 50    This case is far more similar to *Village of Stickney* than it is to *Robbins*. While Ms. Nelson had a history of psychological distress, her disability is linked to an identifiable incident that a civilian would not experience—responding to a report of an armed robbery while facing a failure of communication or support from dispatch. While lack of support and communication might be frustrating for any worker, because Ms. Nelson was in law enforcement, the same treatment significantly affected her perceived safety. Ms. Nelson did not know, when she responded to the call, where the perpetrator was and the fact that she did not end up encountering him does not change what she felt at the time she responded to the call. She reasonably believed that she was in danger and it was a danger that her dispatcher made no effort to protect her from. Unlike in *Robbins*, Ms. Nelson is not complaining of generalized police stress, but rather is struggling to cope psychologically after a specific act of police duty—responding to a call that certainly could have included a physical risk to her—where she felt she was left unsupported by her team.

¶ 51    While Ms. Nelson had longstanding psychological issues and difficulty with her peers, those issues did not cause her to be permanently unable to work until she experienced the incident on December 8, 2016. During that incident, Ms. Nelson was clearly performing police work and the injury she suffered when her coworkers failed to respond to her calls was unique to the danger of police work. We therefore hold that the Board's finding that Ms. Nelson's injury did not occur

in the performance of an act of duty was against the manifest weight of the evidence.

¶ 52                                    IV. CONCLUSION

¶ 53    For the reasons stated above, we set aside the Board's decision and order that Ms. Nelson

be awarded a duty disability benefit.

¶ 54    Circuit court reversed; decision of the Pension Board set aside.