NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 221072-U

NO. 4-22-1072

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 28, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| MICHAEL LUEDTKE, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| THE BOARD OF TRUSTEES OF THE CITY OF | ) | No. 22MR8 |
| BLOOMINGTON POLICE PENSION FUND, | ) | |
|     Defendant-Appellant. | ) | Honorable |
| | ) | Rebecca S. Foley, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Presiding Justice DeArmond and Justice Doherty concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court reversed the decision of the Board and affirmed the trial court's judgment, concluding the Board's finding the applicant was not injured during the alleged line-of-duty incident was against the manifest weight of the evidence.

¶ 2   Plaintiff, Michael Luedtke, applied to the Board of Trustees of the Police Pension Fund of the City of Bloomington (Board) for a disability pension pursuant to article III of the Illinois Pension Code (40 ILCS 5/3-101 to 3-152 (West 2018)). The Board denied Luedtke a line-of-duty disability pension but granted him a not-on-duty disability pension. In January 2022, Luedtke filed a complaint for administrative review in the McLean County circuit court.

¶ 3   On administrative review, the trial court reversed the Board's decision. The Board appeals, arguing that its decision to deny Luedtke a line-of-duty disability pension was proper

because Luedtke was not disabled as the result of an injury incurred in the performance of an act of duty. We disagree and affirm the court's reversal of the Board's decision.

¶ 4                                    I. BACKGROUND

¶ 5                                    A. Pension Application

¶ 6        In October 2019, Luedtke filed an application for a line-of-duty disability pension under section 3-114.1 of the Pension Code (*id.* § 3-114.1), and alternatively, a not-on-duty disability pension under section 3-114.2 (*id.* § 3-114.2). Luedtke alleged he could no longer perform his full duties as a police officer due to an injury he sustained during an altercation with a suspect that occurred while he was on duty. In his application, Luedtke described the incident as follows:

> "On 08/24/18, Ofc. [John] Fermon and I were sent to 2 Rainbow Cir., # 14 for a 911 call. Ofc. Fermon made contact with female who had self-inflicted injuries. We tried to detain her. She resisted. Male suspect inside apartment came out and charged at Ofc. Fermon and myself. I tried to push him back several times, then attempted to arrest him. He resisted for several minutes. During the resisting arrest, my left knee and lower back was [*sic*] injured."

Luedtke claimed his disability included a meniscus tear and lateral meniscus tears; left knee surgery on January 1, 2019; degenerative arthritis in his left knee; and a lower back injury.

¶ 7                                    B. Pension Board Hearing

¶ 8        In December 2020, Luedtke's application proceeded to a hearing before the Board. During opening statements, Luedtke's counsel clarified that although Luedtke still had health issues related to his back, his claimed disability was solely related to his left knee.

¶ 9                                    1. *Luedtke's Testimony*

¶ 10           Luedtke testified he had been employed with the Bloomington Police Department since 2008. Prior to working for the Bloomington Police Department, Luedtke worked for the Woodford County Sheriff's Office and police departments in Minonk and Eureka. To work for the Bloomington Police Department, Luedtke passed a physical examination known as the POWER test.

¶ 11           When Luedtke was 15 years old in 1988, he suffered a knee injury after a dirt biking accident. Specifically, Luedtke tore his anterior cruciate ligament (ACL) in his left knee, which was repaired with surgery. Luedtke injured his left knee again in February 2011 after pursuing a fleeing suspect on foot. The injury was minor, and Luedtke returned to work a day or two after that incident.

¶ 12           Turning to the August 2018 injury, Luedtke testified he and Officer Fermon responded to a 911 hang-up call at an apartment building. Officer Fermon arrived first and had briefly encountered a woman at the door of the apartment, whom Luedtke later identified as Johana, but she shut it upon seeing him. Officer Fermon continued to knock on the door, and upon Officer Luedtke's arrival, Johana finally opened the door again. She had visible cuts to the inside of her wrists, which the officers believed were self-inflicted, and she did not allow them to enter the apartment. Based on her injuries, Officer Fermon stated she needed a medical evaluation. Johana began screaming, and the officers attempted to place her in handcuffs; Officer Fermon grabbed one wrist, and Luedtke grabbed the other. The officers struggled with Johana around the narrow hallway until Luedtke heard a man, whom he later identified as Servonte, yell, " 'Get your hands off of her.' "

¶ 13           Luedtke testified Servonte came up to the officers, and Luedtke ordered him to get back. Luedtke moved way from Officer Fermon and Johana to attempt to subdue Servonte.

Officer Fermon then disengaged with Johana to help Luedtke. Eventually, Officer Fermon tackled Servonte to the ground, but Servonte managed to maneuver himself on top of Officer Fermon, who was on all fours. Luedtke tried to pry Servonte from Officer Fermon, who then tased Servonte twice. Luedtke momentarily moved away from Servonte to avoid the effects of the taser. Luedtke then positioned himself on top of Servonte's back and popped his arm away to secure one wrist in handcuffs. Servonte eventually stood up and put the other arm behind him for Luedtke to finish placing him in handcuffs.

¶ 14　　　　Luedtke testified that he injured his left knee at some point during this altercation. Luedtke explained his "adrenaline was high" and he was not exactly sure if the injury occurred while he was trying to get Servonte to step back or when they were grappling on the floor. Luedtke later prepared a narrative report of the incident, indicating he "twisted [his] back and left knee." Luedtke drove himself to OSF St. Joseph Medical Center (St. Joseph's), where they wrapped his knee and provided him with a pain reliever. Medical staff at St. Joseph's recommended Luedtke receive follow-up care at an occupational health center. After seeing a physician there, Luedtke was referred to Dr. Robert Seidl at the Orthopedic and Sports Enhancement Center, where he was first seen in September 2018. Luedtke testified by this time, his knee was "painful," "completely swollen," and he could "barely put weight on it." Luedtke never returned to work following the incident.

¶ 15　　　　In January 2019, Luedtke underwent arthroscopic surgery at Dr. Seidl's recommendation. Luedtke also received cortisone and Euflexxa injections. After completing the injections in March 2019, Luedtke was still experiencing significant pain and swelling in his left knee. In October 2019, Dr. Joshua Alpert, who he saw as part of the workers' compensation process, recommended Luedtke for a total knee replacement, which the city of Bloomington

authorized. In March 2020, as part of the pension application process, Luedtke was also examined by Dr. Leon Huddleston. In June 2020, Dr. Seidl performed Luedtke's total knee replacement surgery.

¶ 16　　Following surgery, Luedtke's left knee had very little range of motion. The goal was 120 degrees of motion; Luedtke had only 60. In July 2020, Luedtke underwent a manipulation procedure under anesthesia to improve his range of motion. Luedtke's range of motion continued to improve with physical therapy, but he still experienced some pain, neuropathy, tendonitis, and bursitis. Luedtke was never released to return to full, unrestricted police duty, and "light" duty work was not available. Luedtke testified he still could not bend down, squat, lunge, or run.

¶ 17　　During further examination by one of the Board members, Luedtke was asked whether the injury occurred during his struggle with Servonte or, as he purportedly told Dr. Huddleston, when he stepped down from a stair after the arrest. Luedtke clarified he believed the injury occurred during his struggle with Servonte but he did not experience the pain until stepping off a stair after the arrest. He further clarified, when he initially arrived at St. Joseph's for treatment, he was still in uniform and was told there would be a three-hour wait. He subsequently left, changed into plainclothes, and returned to St. Joseph's in his personal vehicle. Luedtke testified his knee was very swollen at this point. Another Board member noted the nurse Luedtke saw in the emergency department indicated Luedtke's left knee was not swollen. Luedtke's attorney countered the left knee X-ray notes indicated "joint effusion," which is another term for swelling. When asked again about exactly when the injury occurred, Luedtke replied, "I don't really know what the mechanism was. I couldn't put my finger on any one thing." Prior to this incident, Luedtke did not experience any pain or discomfort in his left knee.

¶ 18                                    2. *Exhibits*

¶ 19         Board exhibit Nos. 1-18 were admitted into evidence at the beginning of the

hearing.

¶ 20         Board exhibit No. 2 contained Luedtke's patient history records from St. Joseph's.

In the treatment notes from his visit on August 24, 2018, Luedtke was diagnosed with acute low

back pain, thoracic back sprain, and a left knee sprain. The nurse practitioner's notes indicate

Luedtke's left knee exhibited "tenderness" but no swelling. Her notes also indicated the X-ray

revealed "no acute findings such as fracture, subluxation or dislocation." The radiologist's notes

following the left knee X-ray contain an indication of "trauma," including evidence of "small

joint effusion." Luedtke's left knee X-ray also showed preexisting osteoarthritis.

¶ 21         Board exhibit No. 4 contained Luedtke's patient history records from the

Bloomington-Normal Spine Clinic, including his August 27, 2018, visit. Under the "Palpation"

section of the clinical notes, "swelling/edema" is indicated in the left knee, with the intensity

listed as "severe."

¶ 22         Board exhibit No. 6 contained Luedtke's patient history from the Orthopedic and

Sports Enhancement Center. In an October 2018 report prepared by Bradley Cole, a nurse

practitioner, Cole noted Dr. Seidl, Luedtke's knee surgeon, was "[c]ertainly suspicious for

meniscal pathology." Following Luedtke's January 2019 arthroscopy, Dr. Seidl prepared a report

which included postoperative diagnoses of medial and lateral meniscus tears in addition to

patellofemoral arthrosis (*i.e.*, osteoarthritis).

¶ 23         Board exhibit No. 10 contained Dr. Alpert's report, which he prepared after

examining Luedtke on October 8, 2019. Dr. Alpert opined Luedtke's left knee sprain was a result

of the "aggressive" activity Luedtke experienced on August 24, 2018, which "aggravated

[Luedtke's] previously asymptomatic preexisting left knee degenerative meniscus tear and arthritic changes." Dr. Alpert's report also stated, "Regarding his August 24, 2018 work-related left knee injury, I believe the only additional treatment which can help him and is needed at this point is a total knee arthroplasty."

¶ 24        Board exhibit Nos. 14 to 16 contained reports of Luedtke's three independent medical evaluations. In the reports, each of the physicians responded to written interrogatories proposed by the Board. Their individual responses to the interrogatories included the following:

Interrogatory No. 4: "Whether Officer Luedtke's explanation of how the disability occurred is consistent with your findings."

Dr. Huddleston: "Officer Luedtke's explanation of how his disability occurred is consistent with my findings."

Dr. Charuk: "Yes, Officer Luedtke's explanation is consistent with my findings."

Dr. Williams: "The mechanism of injury is consistent with a meniscal injury and exacerbation of arthritis. Complaints were noted right after the episode and the injury was reported."

Interrogatory No. 5: "Whether the alleged disability *** is a direct result of the August 24, 2018 incident; and if so, which specific duty related activity or whether the disability resulted from an aggravation of a pre-existing condition; or whether the August 24, 2018 incident contributed to the disability; or whether the disability is solely caused by a pre-existing condition and unrelated to the August 24, 2018 incident."

Dr. Huddleston: "Officer Luedtke's disability resulted from an aggravation of his pre-existing left knee conditions."

Dr. Charuk: "It is my opinion within a reasonable degree of medical certainty that Officer Luedtke's disability is an aggravation of his preexisting condition with regard to [his] low back and left knee."

Dr. Williams: "The injury was caused by the episode on August 24, 2018. There was pre-existing disease with osteoarthritis present in the knee but this was not the cause of the symptoms. The symptoms appeared immediately after the incident during the duty related activity arresting the suspect."

¶ 25    Board exhibit No. 18 contained footage from both Luedtke's and Officer Fermon's body-worn cameras from August 24, 2018.

¶ 26    C. Board's Decision

¶ 27    Following arguments and additional proceedings in April 2021, the Board voted to deny Luedtke a line-of-duty disability pension but voted in favor of awarding Luedtke a not-on-duty disability pension. In January 2022, the Board issued its written decision and order, which contained its findings of fact and conclusions of law. In its decision, the Board initially states it "does not find Applicant disabled as a result of performing an act of duty." Later, the Board found as follows:

"After reviewing body camera video, the Pension Board finds the incident in which [Luedtke] claims to be injured from would constitute an 'act of police duty inherently involving special risk not ordinarily assumed by a citizen in the ordinary walks of life'. However, the Pension Board specifically finds no

- 8 -

evidence [Luedtke] was injured during the incident. The Pension Board agrees [Luedtke] was in a struggle but finds the male suspect did not lunge at Officer Fermon as testified by [Luedtke]."

The Board found Luedtke's testimony conflicted with what it observed in the body-worn camera footage and in his medical reports. Specifically, the Board found there was no "stoop" or large step at the apartment building entrance, which was where Luedtke alleged he initially felt the shooting pain in his knee. The Board also found Luedtke exaggerated the extent to which he was "wrestling" with Servonte and he never "jumped down" on Servonte during the altercation as he claimed in his testimony. Specifically, the Board noted Luedtke "did not run and was merely standing over the two of them." Additionally, the Board found Officer Fermon's body-worn camera footage showed Luedtke had "no difficulty walking, there is no limp or other indication of injury." The Board emphasized the emergency department nurse noted no swelling in Luedtke's knee, while Luedtke testified his knee became swollen immediately. Although Luedtke alleged he "about went to the ground" after he stepped out of the apartment building due to the pain, the Board found Luedtke exhibited no signs of pain in the video footage.

¶ 28                  D. Administrative Review in the Trial Court

¶ 29        In January 2022, Luedtke filed a complaint for administrative review. Luedtke asserted the Board's finding he failed to show he was injured during the August 24, 2018, incident was against the manifest weight of the evidence and he was entitled to a line-of-duty pension.

¶ 30        In October 2022, the trial court conducted a hearing on the complaint. During arguments, Luedtke emphasized the physicians' reports stating (1) his explanation of how his disability occurred was consistent with their findings and (2) the cause of his disability was an

aggravation of his preexisting degenerative knee conditions. The Board argued its decision was proper because the evidence showed Luedtke's disability was caused by his total knee replacement and he failed to show the August 24, 2018, incident precipitated his need for that procedure. Luedtke countered the Board's decision did not contain such a conclusion but instead stated there was no evidence Luedtke was injured during the incident. Accordingly, Luedtke argued the Board should be precluded from presenting arguments not arising out of its decision and order.

¶ 31    In November 2022, the trial court entered a written order reversing the Board's decision. The court determined the Board's finding Luedtke failed to show he was injured during the August 24, 2018, incident was against the manifest weight of the evidence. The court emphasized none of the physicians who examined Luedtke believed his disability was solely caused by a preexisting condition.

¶ 32    This appeal followed.

¶ 33                II. ANALYSIS

¶ 34    On appeal, the Board argues that its decision to deny Luedtke a line-of-duty pension was proper because he was not disabled as a result of an injury incurred in the performance of an act of duty. Luedtke responds the Board's finding he was not injured during the August 24, 2018, incident was against the manifest weight of the evidence. We reverse the Board's decision and affirm the trial court's judgment.

¶ 35    This court reviews the Board's decision and not the decision of the trial court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531, 870 N.E.2d 273, 292 (2006).

"The applicable standard of review depends upon whether the issue presented is one of fact, one of law, or a mixed question of law and fact. [Citation.] This court will reverse a ruling on a question of fact only if it is against the manifest weight of the evidence. [Citation.] Questions of law are reviewed *de novo*. [Citation.] Mixed questions of law and fact are reviewed under the clearly erroneous standard. [Citation.]" *Jones v. Board of Trustees of the Police Pension Fund of the City of Bloomington*, 384 Ill. App. 3d 1064, 1067, 894 N.E.2d 962, 965 (2008).

¶ 36 Section 3-114.1 of the Pension Code establishes the right of a police officer to receive a "line of duty" disability retirement benefit equal to 65% of his salary at the time the disability is allowed where the disability results from injury incurred in "the performance of an act of duty." 40 ILCS 5/3-114.1 (West 2018). Section 3-114.2 of the Pension Code provides that an officer disabled as the result "of any cause other than the performance of an act of duty" is to receive a disability benefit of 50% of his salary at the time the disability occurs. *Id.* § 3-114.2. "[A] disability pension may be based upon the line-of-duty aggravation of a preexisting physical condition." *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 505, 877 N.E.2d 1101, 1113 (2007). Stated differently, "[t]here is no requirement that the duty-related incident be the originating or primary cause of the injury, although a sufficient nexus between the injury and the performance of the duty must exist." *Barber v. Board of Trustees of the Village of South Barrington Police Pension Fund*, 256 Ill. App. 3d 814, 818, 630 N.E.2d 446, 449 (1993), *abrogated on other grounds*, *Kouzoukas v. Retirement Board of the Policemen's Annuity and Benefit Fund of the City of Chicago*, 234 Ill. 2d 446, 917 N.E.2d 999 (2009).

¶ 37    The parties agree Luedtke is permanently disabled. In its written decision and order, the Board found Luedtke failed to show he was injured during the incident on August 24, 2018. On appeal, the Board represents its findings differently. Instead, it asserts it found Luedtke disabled due to his total knee replacement and Luedtke failed to present sufficient evidence this procedure was precipitated by his alleged injury on August 24, 2018. The Board's written decision and order does not contain such a finding. Although the scope of this court's review "extend[s] to all questions of law and fact presented by the entire record," we may not consider any new or additional evidence beyond the administrative record before us. 735 ILCS 5/3-110 (West 2018). Accordingly, we will review the Board's finding that Luedtke presented "no evidence [he] was injured during the incident."

¶ 38    The parties also agree the issue of whether Luedtke was injured during the August 24, 2018, incident is a factual question reviewed under the manifest weight of the evidence standard. Under this standard, the Board's finding will be found to be against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Wade*, 226 Ill. 2d at 504. Additionally, on administrative review, the "findings and conclusions of the administrative agency on questions of fact shall be held to be *prima facie* true and correct." 735 ILCS 5/3-110 (West 2018). As factfinder, it is the duty of the Board to assign the appropriate weight to the evidence, resolve conflicts in the evidence, and determine the credibility of witnesses. *Prawdzik v. Board of Trustees of the Homer Township Fire Protection District Pension Fund*, 2019 IL App (3d) 170024, ¶ 36, 126 N.E.3d 392. This court is not to reweigh the evidence or make an independent determination of the facts. *Hoffman v. Orland Firefighters' Pension Board*, 2012 IL App (1st) 112120, ¶ 18, 981 N.E.2d 429. However, "our deference to the Board is not limitless." *Scatchell v. Board of Fire and Police Commissioners for Melrose Park*, 2022 IL App (1st)

201361, ¶ 37. "An agency's decision can still be against the manifest weight of the evidence even if some evidence supports the agency's decision." *Ashmore v. Board of Trustees of Bloomington Police Pension Fund*, 2018 IL App (4th) 180196, ¶ 41, 138 N.E.3d 93.

¶ 39 Here, the Board's finding there was "no evidence" Luedtke was injured during the August 24, 2018, incident was against the manifest weight of the evidence. Even deferring to the Board's credibility determinations—specifically, that Luedtke "exaggerated" the extent to which he wrestled with Servonte and there was no stoop at the apartment building entrance—the Board acknowledged Fermon's body-worn camera footage showed a physical struggle between Luedtke and Servonte. Specifically, the Board noted Luedtke "did not run and was merely standing over the two of them." However, it also acknowledged Luedtke was down on his knees attempting to subdue Servonte and place him in handcuffs. Additionally, in the video footage after the subjects are in custody, Officer Fermon can be heard explaining to another officer, "I can say for sure if Luedtke got hurt this is a real fight, not like some joke." Moreover, despite the Board's finding Luedtke did not exhibit any outward signs of injury in the video footage, Luedtke can be seen limping after stepping down from the curb and onto the street after the officers escorted Servonte and Johana out of the apartment building. He can also be observed leaning on his vehicle for support.

¶ 40 Additionally, the Board found Luedtke's version of events was inconsistent as he sometimes stated he was injured in the hallway and sometimes stated he was injured when he stepped down from a stoop or stair. Luedtke specifically testified at the hearing he did not know exactly when the injury occurred. The record shows Luedtke consistently informed his health care providers he believed he was injured at some point during this incident but did not feel pain until stepping down from a stair or step after exiting the apartment building. These alleged

"inconsistencies" do not contradict the undisputed facts Luedtke was involved in a violent physical altercation with Servonte as seen in the body-worn camera footage and immediately sought care for the alleged injury.

¶ 41　　　　The medical reports also overwhelmingly indicate Luedtke suffered an aggravation of preexisting conditions in his left knee during the August 24, 2018, altercation. First, no left knee pain is reported in any of Luedtke's patient history prior to the incident other than his 1988 ACL tear and the foot pursuit accident in 2011. While the emergency department staff did not indicate swelling or acute findings from initial X-rays, they did indicate small joint effusion and diagnosed Luedtke with a left knee sprain. Additionally, the Bloomington-Normal Spine Clinic notes from just three days later noted "severe" swelling and edema and limited range of motion in Luedtke's left knee. Dr. Seidl's postoperative diagnoses following the January 2019 left knee arthroscopy indicated medial and lateral meniscus tears. Dr. Alpert's October 2019 report opined Luedtke's left knee sprain was a result of the "aggressive" activity Luedtke experienced on August 24, 2018, which "aggravated [Luedtke's] previously asymptomatic preexisting left knee degenerative meniscus tear and arthritic changes." All three of the physicians who performed independent medical evaluations agreed Luedtke's version of how the disability occurred was consistent with their findings. Two of the three physicians indicated the disability was a result of an "aggravation" of preexisting degenerative conditions. Dr. Williams specifically opined Luedtke was injured during the incident on August 24, 2018, and while "[t]here was pre-existing disease with osteoarthritis present in the knee," it was not the cause of Luedtke's symptoms. He also noted, "[t]he symptoms appeared immediately after the incident during the duty related activity arresting the suspect." Although invited to do so, none of

the physicians believed Luedtke's disability was *solely* a result of preexisting degenerative conditions.

¶ 42　　　　In this case, the Board's finding Luedtke was not injured during the August 24, 2018, incident was against the manifest weight of the evidence because the opposite conclusion is clearly apparent. The Board's decision ignored the ample objective medical evidence of Luedtke's injury and the opinions of its own chosen independent medical evaluators. The Board has already concluded "the incident in which [Luedtke] claims to be injured from would constitute an 'act of police duty inherently involving special risk not ordinarily assumed by a citizen in the ordinary walks of life.' " Because the Board's finding he was not injured during this incident was against the manifest weight of the evidence, it follows the Board's finding he was not injured during an act of duty is also against the manifest weight of the evidence. In concluding the Board's decision was against the manifest weight of the evidence despite deferring to its finding Luedtke's testimony was not credible, we need not address Luedtke's additional claim the Board erroneously attacked Luedtke's credibility with collateral matters regarding an unrelated prior injury in 2017. Accordingly, we reverse the decision of the Board and affirm the trial court's judgment.

¶ 43　　　　　　　　　　　　III. CONCLUSION

¶ 44　　　　For the reasons stated, we reverse the decision of the Board and affirm the trial court's judgment.

¶ 45　　　　Trial court judgment affirmed.

¶ 46　　　　Board decision reversed.